# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 4

### OCTOBER TERM, A.D. 2020

January 7, 2021

MARTIN ALAN RIDINGER,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-20-0090

*Appeal from the District Court of Albany County*
The Honorable Tori R.A. Kricken, Judge

*Representing Appellant:*
> Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Catherine M. Mercer, Assistant Attorney General. Argument by Ms. Mercer.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]     Martin Alan Ridinger appeals from his conviction for first-degree sexual assault. He claims the State's delay in bringing charges against him denied him due process and the prosecutor improperly commented on his right to remain silent during closing argument.  We affirm.

### ISSUES

[¶2]     Mr. Ridinger raises two issues:

1.  Did the State's delay in charging Mr. Ridinger violate his right to due process under the Fifth Amendment to the United States Constitution?

2.  Did the prosecutor's comments during closing argument violate Mr. Ridinger's right to remain silent under the Fifth Amendment to the United States Constitution and art. 1, § 11 of the Wyoming Constitution?

### FACTS

[¶3]     In 2010, SW was staying with Keith and Krystal Porter in Laramie, Wyoming.[1]  In the early morning hours of July 1, 2010, while the Porters were asleep in their bedroom and SW was asleep on the living room couch, John Schnitker and Mr. Ridinger arrived at the house.  SW and Mr. Porter woke up and "hung out" with Mr. Schnitker and Mr. Ridinger in the living room.  After a few hours, Mr. Schnitker and Mr. Ridinger offered to take SW to the store to buy cigarettes.  She agreed to go with them; Mr. Porter stayed home.

[¶4]     Mr. Schnitker drove, Mr. Ridinger sat in the front passenger seat, and SW sat in the back seat behind Mr. Schnitker.  Instead of going to buy cigarettes, Mr. Schnitker went to Walmart and bought bottles of air duster.  After he and Mr. Ridinger huffed some air duster, Mr. Schnitker said he needed to stop at his grandmother's house to "grab something really quick."

[¶5]     Mr. Schnitker parked the car between the house and a shed, got out of the car, opened SW's door, pulled down his pants, and stuck his penis in her face.  She pushed him away with her hand and told him to take her home.  Mr. Schnitker then reached for her underwear; SW told him, "Please don't.  I'm on my period."  Mr. Schnitker ignored her, pulled down her underwear, took out her tampon, and penetrated her vagina with his penis.

---

[1] At the time of trial, SW had a different surname.  We will refer to her as SW, her initials at the time of the offense.

1

In the meantime, Mr. Ridinger had moved from the front-passenger seat to the back-passenger seat. While still penetrating her vagina with his penis, Mr. Schnitker flipped SW over from her back to her stomach, grabbed her hair with his hand, and forced her mouth on Mr. Ridinger's penis. At some point, Mr. Schnitker told Mr. Ridinger "it was his turn" and they switched positions, with Mr. Ridinger penetrating SW's vagina with his penis and Mr. Schnitker forcing SW to perform fellatio on him.

[¶6]    Mr. Schnitker and Mr. Ridinger eventually got back into the front seats of the car, and Mr. Schnitker drove to a Loaf 'N Jug on South Third Street to buy cigarettes. They then took SW back to the Porters' house. When SW got out of the car, Mr. Schnitker made her kiss him and told her if she told anybody what had happened, she would be dead. When she got inside the Porters' house, she collapsed to the floor and started crying. Mrs. Porter called the police.

[¶7]    Albany County Sheriff's Deputy Bill Smith and Sergeant Curtis Hicks responded to the Porter residence. SW told them Mr. Schnitker and Mr. Ridinger had sexually assaulted her and described the details and location of the assault. Sergeant Hicks went to the scene to gather evidence, including SW's tampon, but found nothing. Mrs. Porter drove SW to the hospital, where a Sexual Assault Nurse Examiner (SANE nurse) prepared a rape kit, including taking swabs of SW's cervix. The nurse noted SW was menstruating and found a red abrasion on her cervix. Subsequent DNA testing revealed the presence of Mr. Ridinger's DNA on SW's cervical swabs and clothing.

[¶8]    The State charged Mr. Ridinger with two counts of first-degree sexual assault in violation of Wyo. Stat. Ann. § 6-2-302(a)(1) (LexisNexis 2019) based on the vaginal intercourse (Count 1) and fellatio (Count 2). Mr. Ridinger did not testify at trial, but the State played for the jury a recorded interview he had with a detective in August 2018. During the interview, Mr. Ridinger initially denied knowing SW and having sex with her. However, upon being confronted with SW's accusations against him, Mr. Ridinger admitted SW asked him to have a threesome with her and Mr. Schnitker. He claimed she performed fellatio on him in Mr. Schnitker's vehicle while parked in the grandmother's driveway. He denied having vaginal intercourse with her.

[¶9]    Mr. Schnitker also testified the sexual encounter was consensual. He told the jury that while they were at the Porters' house, he and Mr. Ridinger "grop[ed]" and kissed SW and she "grop[ed]" each of them. They left the Porters and drove to his grandmother's house because they wanted to have a threesome and he wanted to see his cousin, who was staying there. Once they arrived at his grandmother's house, Mr. Schnitker watched the horses while SW and Mr. Ridinger "were making out in the back seat, fooling around." SW eventually began rubbing Mr. Schnitker's chest and said, "[C]ome on, don't you want to get in on this?" Mr. Schnitker reclined his seat, unbuttoned his pants, and SW began giving him oral sex. After a few minutes, he went to the back seat and had vaginal intercourse with SW while she performed fellatio on Mr. Ridinger. He denied SW was on

2

her period or that he removed a tampon. After about 10 minutes, Mr. Schnitker returned to the driver's seat and drove to two different Loaf 'N Jugs on South Third Street to buy cigarettes. Because he did not have an ID, the stores refused to sell to him. After dropping Mr. Ridinger off on Fourth Street, he and SW drove to a Kum and Go, where he went inside and purchased cigarettes while SW stayed in the vehicle. He then dropped SW off at the Porters' house.

[¶10] Mr. Porter told the jury he woke up at about 2:30-3:30 a.m. on July 1, 2010, because he heard "inappropriate noises" coming from the spare bedroom. He described the noises as "whispering, giggling sounds of – like what could have been [sexual] foreplay or was foreplay at the time." He went to the spare bedroom where he found Mr. Schnitker with his hand up SW's nightgown and SW groping Mr. Ridinger. Mr. Porter told them they were being too loud and Mr. Schnitker and Mr. Ridinger had to leave. SW grabbed a coat and went with them. Mr. Porter woke up Mrs. Porter and told her "there was some weird things going on," and he believed SW "would come back to [the] house at some point and claim rape." A few hours later, he observed a vehicle pull up in the alley. SW exited the car from the back seat and walked up the driveway "like nothing had even happened." As soon as she got in the house, she collapsed to the floor and "started crying and said she'd been raped." Mr. Porter admitted he did not know what had occurred after SW left the home with Mr. Schnitker and Mr. Ridinger.

[¶11] The jury found Mr. Ridinger guilty on Count 1 (vaginal intercourse) and not guilty on Count 2 (fellatio). The district court sentenced him to 30-50 years imprisonment. Mr. Ridinger appealed.

[¶12] Additional facts will be provided as needed in our discussion of the issues.


**DISCUSSION**

### 1. Due Process/Pre-Charging Delay

[¶13] The offense occurred on July 1, 2010. The State, however, did not file charges against Mr. Ridinger until February 15, 2019, over 8½ years later. Mr. Ridinger argues the lengthy pre-charging delay violated his Fifth Amendment right to due process. Our review is de novo. *Remmick v. State*, 2012 WY 57, ¶ 15, 275 P.3d 467, 470 (Wyo. 2012); *Humphrey v. State*, 2008 WY 67, ¶ 32, 185 P.3d 1236, 1246 (Wyo. 2008) (citations omitted).

[¶14] "Wyoming has no statute of limitations for criminal offenses, and prosecution for such offenses may be commenced at any time during the life of the offender." *Phillips v. State*, 835 P.2d 1062, 1069 (Wyo. 1992) (citing *Story v. State*, 721 P.2d 1020, 1026 (Wyo. 1986)). Excessive delay in bringing charges, however, may violate due process. *Fortner*

3

*v. State*, 843 P.2d 1139, 1142 (Wyo. 1992) (citation omitted). To establish a due process violation, the defendant must show: (1) the State intentionally delayed bringing charges to gain a tactical advantage over him <u>and</u> (2) he suffered actual prejudice as a result of the pre-charging delay. *Humphrey,* ¶ 34, 185 P.3d at 1247 (citing *United States v. Marion*, 404 U.S. 307, 323-26, 92 S.Ct. 455, 465-66, 30 L.Ed.2d 468 (1971)) (other citations omitted). *See also, Fortner*, 843 P.2d at 1142 ("Wyoming has taken a *conjunctive* approach to the *Marion* rule which requires the defendant to establish *both* an improper prosecutorial motivation which caused the delay and substantial prejudice resulting from it.") (emphasis in original) (citation omitted). Mr. Ridinger has failed to satisfy either prong.

[¶15] Mr. Ridinger claims "[i]t is impossible to ever prove emphatically exactly what the State was thinking" when it decided to pursue the charges 8½ years after the incident. However, he argues the record shows the State opted not to bring charges against him in 2010 "when memories were sharp and evidence could have been evaluated" because it "clearly believed that the evidence would not support the prosecution, let alone the conviction." Instead, he maintains, the State purposefully waited until memories had faded and key evidence was lost to bring charges against him, thereby gaining a tactical advantage over him at trial. The record does not support Mr. Ridinger's argument.

[¶16] Shortly after the offense, Deputy Smith collected SW's clothing and rape kit from the hospital, conducted a recorded interview with SW, showed her a photo line-up, and took pictures of Mr. Schnitker's grandmother's house. In August 2010, he turned the case over to Rob DeBree, the Sheriff's Office's only detective at the time, for further investigation. Detective DeBree conducted a recorded interview of Mr. Schnitker but could not locate Mr. Ridinger. In November 2010, Detective DeBree was appointed undersheriff and his active investigations were assigned to Officer William Meyer. For some unknown reason, this case was not among them. As a result, Officer Meyer was not aware of the case in 2010. Moreover, no one from the Sheriff's Office submitted SW's rape kit to the State Crime Lab for analysis in 2010.

[¶17] In 2017, the State Crime Lab received a grant to collect and process all rape kits in the state. Per a request from the Lab, the Albany County Sheriff's Office sent all rape kits in its possession, including SW's, to the Lab. In August 2018, the Lab informed Officer Meyer that an analysis of SW's cervical swabs from her rape kit had detected male DNA. The Lab told him it would run the male DNA in the Combined DNA Index and notify him if there was a match. In November 2018, the Lab informed Officer Meyer the male DNA found on SW's cervical swabs matched Mr. Ridinger's.

[¶18] Armed with this new information, Officer Meyer re-opened the investigation. He found Deputy Smith's report, which mentioned the recorded interview with SW, the photo line-up, and the pictures taken of the grandmother's house. However, none of that evidence could be located. Officer Meyer also learned of Detective DeBree's 2010 recorded interview of Mr. Schnitker, but he could not find the recording and could not speak with

4

Detective DeBree because he had died in September 2016. The only evidence Officer Meyer found from the initial investigation was SW's rape kit and the clothing she was wearing during the assault which the SANE nurse had collected from her at the hospital. Officer Meyer located SW and Mr. Schnitker and re-interviewed them, took new photographs of the grandmother's house, and showed SW a new photo line-up. He located Mr. Ridinger in Washington and had a detective in that jurisdiction interview him. He also sent SW's clothing to the State Crime Lab because it had not been sent in 2010. Approximately six months after Officer Meyer first learned about the case, the State brought charges against Mr. Ridinger.

[¶19] The above evidence shows the State's delay in charging Mr. Ridinger was not an intentional ploy to gain a tactical advantage over him but rather the result of an inability to locate Mr. Ridinger in 2010, the failure of SW's rape kit to be submitted to the Lab in 2010, and the failure of the case to be turned over to Officer Meyer upon Detective DeBree's promotion to undersheriff in November 2010. Because Mr. Ridinger could not be found in 2010, the prosecutor at the time may have exercised his or her discretion to not bring charges until he was found. In such a situation, "we are not willing to second guess the exercise of prosecutorial discretion." *See Bush v. State*, 2008 WY 108, ¶ 74, 193 P.3d 203, 221-22 (Wyo. 2008) (concluding Mr. Bush had not shown the State intentionally delayed prosecuting him for his wife's murder in order to gain a tactical advantage over him; the prosecutor at the time of the murder may have exercised his discretion in not bringing charges because the wife's body could not be found). In 2018, armed with new evidence, namely the presence of Mr. Ridinger's DNA on SW's cervical swabs, a different prosecutor exercised her discretion to bring charges against Mr. Ridinger.

[¶20] It is troublesome that SW's rape kit was not sent to the Lab in 2010 and that the investigation was not assigned to Officer Meyer in November 2010. It is also disturbing that certain evidence was either lost or not properly preserved. Nevertheless, there is no indication that these failures were intentional, as opposed to merely negligent. Indeed, Mr. Ridinger's expert in police practices and procedure testified he did not attribute the missing evidence to any sort of corruption. Ordinary negligence on the part of the State is not enough to establish a due process violation; the State must act intentionally. *Humphrey,* ¶ 34, 185 P.3d at 1247. *See also, United States v. Comosona*, 614 F.2d 695, 696 n.1 (10th Cir. 1980) ("It is important to observe that something more than ordinary negligence on the part of Government representatives must be shown, no matter how high the actual proof of prejudice is. The Government's delay must be intentional and purposeful.") (citation omitted).

[¶21] Although Mr. Ridinger's failure to satisfy the first prong of a due process violation is determinative, he has also failed to show he was prejudiced by the pre-charging delay. "To show prejudice, an appellant must demonstrate 'the loss of a witness, exhibit or other evidence, *the presence of which would probably bring a different result.*'" *Remmick,* ¶ 17, 275 P.3d at 471 (emphasis added) (quoting *Phillips*, 835 P.2d at 1069). "[O]nly 'actual

prejudice, not possible prejudice,' will suffice to establish that a delay in prosecution resulted in a due process violation." *Id.*

[¶22] Mr. Ridinger points to his failure (in his recorded interview) and that of Mr. Schnitker (at trial) to recall key details of the offense. However, Mr. Ridinger has not shown the pre-charging delay caused their inability to recall. *See State v. Hutchins*, 433 A.2d 419, 423 (Me. 1981) (concluding defendant had failed to show the pre-indictment delay caused the unavailability of three inmate witnesses because he had not indicated when these inmates had been released and if the inmate witnesses had been "released soon after the crime was committed, they could have become unavailable even if defendant had been indicted within a short period"). In his recorded interview, Mr. Ridinger told the detective his substantial drug abuse since the offense had affected his memory. While Mr. Schnitker testified his memory of the event was not as good as it was at the time of the offense due to the passage of time, he also said his memory was "pretty bad altogether anymore" due to his substance abuse and "partying." Even if during the pre-charging delay Mr. Ridinger and Mr. Schnitker had damaged their mental capacity by excessive drug use, Mr. Ridinger has failed to show how better memories would have changed the result of the trial. He suggests only that his inability to recall "probably" played a role in his decision not to testify. Again, "'actual prejudice, not possible prejudice'" is required to establish a due process violation. *Remmick*, ¶ 17, 275 P.3d at 471 (quoting *Phillips*, 835 P.2d at 1069). *See also, Vernier v. State*, 909 P.2d 1344, 1350 (Wyo. 1996) (defendant's claim he "might have recalled an alibi" had the State charged him at the time of the victims' accusations was too speculative because he "attache[d] no specificity to that prospect . . . such as the names of individuals with whom he spent time or activities in which he participated").

[¶23] Moreover, as we recognized in *Fortner*, the passage of time also prejudices the State, as the inability of its witnesses to recall past events may make it more difficult or impossible for it to satisfy its burden of proving the defendant's guilt beyond a reasonable doubt. *Fortner*, 843 P.2d at 1143 ("When it is the *prosecution's* witnesses who have suffered memory losses, the State is prejudiced at least as much as, or more than, the defendant." (emphasis in original) (citations omitted)). That was true in this case. SW did not recall certain details of the incident due to the passage of time and provided some testimony that was inconsistent with her statement to Deputy Smith and the written statement she provided to the SANE nurse. Mr. Ridinger took advantage of her inability to recall by pointing out the inconsistencies on cross-examination.

[¶24] Mr. Ridinger also claims the delay prejudiced him because key evidence was lost or destroyed, including (1) Deputy Smith's 2010 interview with SW; (2) Deputy Smith's 2010 photographs of the grandmother's house; (3) the photo line-up Deputy Smith had shown SW in 2010; (4) Detective DeBree's 2010 recorded interview with Mr. Schnitker; (4) Detective DeBree's testimony; and (5) the surveillance video from the Loaf 'N Jug. According to him, "[g]iven the closeness of this case, and the fact that the jury at one point

6

during deliberation appeared to be deadlocked, all of this lost or uncollected evidence could easily have tipped the scales and resulted in a more favorable verdict."

[¶25] Mr. Ridinger fails to identify what Detective DeBree's testimony and the lost interviews, photo line-up, and photographs would have shown or how they would have helped him. Such vague and conclusory allegations of prejudice are insufficient. *Phillips*, 835 P.2d at 1069. *See also, United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998) ("Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice. Defendant must show definite and not speculative prejudice, and in what specific manner missing witnesses would have aided the defense." (citing *United States v. Jenkins*, 701 F.2d 850, 855 (10th Cir. 1983)); *McDermott v. State*, 897 P.2d 1295, 1300 (Wyo. 1995) ("Appellant does not indicate what the testimony of the exculpatory witness would have been; therefore, Appellant has failed to show that he was prejudiced by the loss of this witness."), *called into doubt on other grounds by Hall v. State*, 911 P.2d 1364 (Wyo. 1996).

[¶26] Moreover, Officer Meyer re-interviewed SW and Mr. Schnitker. While they were not the same interviews as those conducted in 2010, Mr. Ridinger used SW's current interview to impeach her testimony at trial. Officer Meyer also took new pictures of the grandmother's house, which were shown to the jury at trial. There is no indication the house changed in any significant way between 2010 and trial, and Mr. Ridinger does not explain how the pictures from 2010 would have changed the outcome of the trial, especially since Sergeant Hicks told the jury his search of the scene immediately after the assault uncovered no evidence. With respect to the photo lineup in 2010, the only mention of it at trial was Officer Meyer indicating it had been done and that he had shown SW a new lineup in 2018 because the 2010 lineup could not be found. In any event, as Mr. Ridinger recognizes, his identity was never at issue. The only issue at trial was whether the sexual conduct was consensual. As a result, he has not shown how having access to the 2010 photo line-up would have made a difference at trial.

[¶27] With respect to the surveillance video, Officer Meyer testified Deputy Smith's 2010 report indicated he had contacted the manager at the Loaf 'N Jug at 818 South Third Street to obtain video from the surveillance camera. The manager informed Deputy Smith the video would be available in two days. Deputy Smith did not pick up the video, and it was eventually thrown away.

[¶28] Mr. Ridinger argues the destruction of the surveillance video from the Loaf 'N Jug was especially harmful because it would have shown whether Mr. Schnitker or SW had a better memory of the event and therefore whether Mr. Schnitker or SW was more credible. In particular, he claims the video would have clarified an important fact as to who went into the store and whether cigarettes were purchased. Mr. Schnitker testified he and Mr. Ridinger went into a Loaf 'N Jug on Third Street and then drove to another Loaf 'N Jug. Both times they were denied cigarettes. He then dropped off Mr. Ridinger, before

7

proceeding to a Kum and Go, where he went in to purchase cigarettes while SW waited in the car. On the other hand, he alleges SW initially told the jury "they" went into the Loaf 'N Jug on South Third but later said only Mr. Schnitker went into the store. Mr. Ridinger maintains the surveillance video would have resolved this apparent inconsistency in witness testimony. In addition, he asserts the video would provide additional evidence, in that: (1) "it could show who was in the vehicle, and the location of the people in the vehicle"; (2) "[i]t could possibly depict mannerisms and how parties were engaging and acting"; and (3) "[i]t would show if [SW] ever got outside of the vehicle when Mr. Schnitker or Mr. Ridinger were not present."

[¶29] At the outset, we note Mr. Ridinger is mistaken as to SW's testimony. She initially told the jury that only Mr. Schnitker went inside the store and purchased cigarettes. Later, she said, "[T]hey drove me to the Loaf 'N Jug on South 3rd. They got back in the car, we drove off." However, immediately thereafter, she clarified that only Mr. Schnitker went in the store. Nevertheless, Mr. Ridinger's argument that the surveillance video would have produced a different result is speculative at best. The record indicates the surveillance video came from the Loaf 'N Jug on 818 South Third Street. While SW testified they stopped at only one Loaf 'N Jug on South Third Street, Mr. Schnitker told the jury they stopped at two Loaf 'N Jugs on South Third Street but did not clarify for the jury which one they stopped at first. As a result, it is unclear which event the video would depict. Additionally, the video would only have possibly shown whether SW or Mr. Schnitker had a better memory of what occurred <u>after the assault</u>, not necessarily who had the better memory of what occurred <u>during the assault</u>. Finally, neither SW nor Mr. Schnitker testified SW got out of the vehicle while either Mr. Schnitker and/or Mr. Ridinger went into the store. Therefore, it is entirely speculative the video would reveal information as to SW's mannerisms or her interactions with anyone else in the vehicle, let alone that any of that information would be exculpatory.

[¶30] Mr. Ridinger has failed to show the State's delay in charging him violated his right to due process.

### 2. Prosecutorial Misconduct

[¶31] The prosecutor started his closing argument with the following statements:

> The Defendant's semen was found inside of [SW's] vagina on her cervix. This is semen on a cervical swab, not touch DNA from fingers. *At the end of this week, the only person willing to explain how Martin Ridinger's semen ended up inside of her is [SW].*

8

*The only explanation as to why the Defendant's seminal
fluid was found in the victim's cervix has come from [SW]'s
testimony, and nobody else who has testified here today.*

(Emphasis added). Mr. Ridinger claims the prosecutor's statements that only SW was "willing to explain" how his semen ended up inside her and that no other witness provided an alternative explanation, when he was the only one who could have provided an alternative explanation, violated his right to remain silent under the Fifth Amendment and art. 1, § 11 of the Wyoming Constitution.

[¶32] Mr. Ridinger argues our review of the prosecutor's comments is de novo because they implicated his constitutional right to remain silent. We normally review constitutional questions de novo. *Wilkie v. State*, 2002 WY 164, ¶ 4, 56 P.3d 1023, 1024 (Wyo. 2002) ("Constitutional issues are questions of law that we review de novo." (citing *Taylor v. State*, 7 P.3d 15, 19 (Wyo. 2000)). However, because Mr. Ridinger did not object to the prosecutor's comments at trial, the plain error standard applies. *Dixon v. State*, 2019 WY 37, ¶ 39, 438 P.3d 216, 231 (Wyo. 2019) (citing *Black v. State*, 2017 WY 135, ¶ 13, 405 P.3d 1045, 1050 (Wyo. 2017)). This is true even when, as here, the comments are alleged to have violated constitutional rights. *See Hartley v. State*, 2020 WY 40, ¶¶ 9-10, 460 P.3d 716, 719 (Wyo. 2020) (reviewing for plain error Mr. Hartley's claim that the prosecutor's closing argument improperly commented on his constitutional right to remain silent because he did not object at trial).

[¶33] To satisfy the plain error standard, Mr. Ridinger must show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice. *Mraz v. State*, 2016 WY 85, ¶ 55, 378 P.3d 280, 293 (Wyo. 2016) (citing *Butler v. State*, 2015 WY 119, ¶ 16, 358 P.3d 1259, 1264 (Wyo. 2015)). *See also, Brown v. State*, 2019 WY 102, ¶ 13, 450 P.3d 208, 211 (Wyo. 2019). In conducting this review, we are mindful of our "reluctan[ce] to find plain error in closing arguments lest the trial court becomes required to control argument because opposing counsel does not object." *Trujillo v. State*, 2002 WY 51, ¶ 4, 44 P.3d 22, 24 (Wyo. 2002) (quotations omitted).

[¶34] The first prong of plain error review is satisfied because the allegedly improper comments clearly appear in the record. Under the second prong, Mr. Ridinger "must demonstrate the existence of a clear and unequivocal rule of law which the particular facts transgress in a clear and obvious, not merely arguable, way." *Brown*, ¶ 13, 450 P.3d at 211 (quotations omitted).

[¶35] It is a clear and unequivocal rule of law, under both the Fifth Amendment of the United States Constitution and art. 1, § 11 of the Wyoming Constitution, that a prosecutor may not directly or indirectly comment upon a defendant's failure to testify. *See, e.g., Hartley*, ¶ 12, 460 P.3d at 719; *Fortner*, 843 P.2d at 1146-47; *Cyrus v. State*, 639 P.2d 900,

902 (Wyo. 1982); *Boyd v. State*, 528 P.2d 287, 292 (Wyo. 1974). However, Mr. Ridinger has not shown the prosecutor's comments violated this rule of law in a clear and obvious way.

[¶36] Whether a prosecutor has improperly commented on a defendant's refusal to testify turns on "'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *Oldham v. State*, 534 P.2d 107, 112 (Wyo. 1975) (quoting *Knowles v. United States*, 224 F.2d 168, 170 (10ᵗʰ Cir. 1955)). "[W]e consider the entire context in which the statements were made to decide whether there was an impermissible comment upon the defendant's exercise of his right of silence." *Hartley*, ¶ 13, 460 P.3d at 720 (quotations omitted). Importantly, "'[i]t is not improper for the [prosecutor] to draw attention to the failure or lack of evidence on a point if it is not intended to call attention to the failure of the defendant to testify.'" *Oldham*, 534 P.2d at 112 (quoting *Knowles*, 224 F.2d at 170). *See also, Larkins v. State,* 2018 WY 122, ¶ 95, 429 P.3d 28, 50 (Wyo. 2018) ("In closing arguments, a prosecutor has 'wide latitude' to argue the evidence in the record and all reasonable inferences which can be drawn from that evidence.") (citations and quotations omitted); *Dysthe v. State*, 2003 WY 20, ¶ 24, 63 P.3d 875, 884 (Wyo. 2003) ("Prosecutors, just like defense counsel, may review the evidence and suggest to the jury inferences based thereon.") (citation omitted).

[¶37] Viewing it in context, the prosecutor's comment that "the only person willing to explain how Martin Ridinger's semen ended up inside of [SW] is [SW]" did not constitute a direct or indirect comment on Mr. Ridinger's failure to testify. Rather, it was a fair comment on the state of the evidence. Mr. Ridinger did not physically testify at trial, but his recorded interview was played for the jury. In that interview, he claimed only to have had oral sex with SW and explicitly denied having vaginal sex with her. Mr. Schnitker also testified he only saw SW perform oral sex on Mr. Ridinger. SW, on the other hand, told the jury Mr. Ridinger penetrated her vagina with his penis. The prosecutor correctly pointed out to the jury that SW was the only person who explained how Mr. Ridinger's semen ended up on her cervix.

[¶38] The fact that the prosecutor was commenting on the evidence, and not Mr. Ridinger's failure to testify, is borne out when the comments are viewed in the context of the prosecutor's entire closing argument. Later in his argument, the prosecutor reiterated Mr. Ridinger's recorded statement that SW performed oral sex on him but they "definitely did not have vaginal sex." The prosecutor then stated, "if this is the case then why was Martin Ridinger's semen found in her vagina and on her cervix?" Similarly, the prosecutor repeated Mr. Schnitker's story, including that SW and Mr. Ridinger "did not have [vaginal] sex that night." Again, the prosecutor asked the jury if that made "sense" given that "Marty's semen was found inside of [SW]'s vagina on her cervix."

[¶39]   Our recent decision in *Hartley* is instructive.  Mr. Hartley was charged with, *inter alia*, first-degree felony murder and aggravated child abuse of his girlfriend's two-year-old son.  *Hartley*, ¶¶ 3, 5, 460 P.3d at 717-18.  Mr. Hartley did not testify at trial, but the State introduced evidence of his statements to law enforcement.  *Id.*, ¶ 5, 460 P.3d at 718.  During closing argument, the prosecutor referred to Mr. Hartley's statement to law enforcement that the child had hit the back of his head:  "When asked why on earth then would [the child] have these injuries to the front of his face,  the frenulum tear, and the bite on the tongue if he hit the back of his head—that doesn't make sense**—[Mr. Hartley] had nothing he could offer**."  *Id.*, ¶ 11, 460 P.3d at 719 (emphasis in original).  The prosecutor also commented on where pieces of physical evidence were found in the home and how that evidence failed to align with Mr. Hartley's statements to the police:

> More concerning is, according to Mr. Hartley, there was no reason they would be that day in this hallway bathroom. But in the hallway bathroom, you have Item 12, Item 29, Item 30, and Item 31 of tested material. Three of those items tested positive for [the child]'s blood. **And yet no explanation for why they could have been there** other than the result of the abuse that we know actually occurred in that home.

*Id.*, ¶ 11, 460 P.3d at 719 (emphasis in original).

[¶40]   Applying the plain error standard because Mr. Hartley did not object at trial, we concluded it was a clear and unequivocal rule of law that a prosecutor may not comment on a defendant's constitutional right to remain silent.  *Id.*, ¶¶ 9, 12, 460 P.3d at 719.  However, we decided the prosecutor's comments did not violate this rule of law.  *Id.*, ¶ 12, 460 P.3d at 719.  We explained:

> Viewing the prosecutor's statements in context, the prosecutor did not comment on Mr. Hartley's right to remain silent or shift the burden to the defense.  Rather, she compared the statements Mr. Hartley made to law enforcement to the physical evidence admitted during trial and indicated inconsistencies.

*Id.*, ¶ 13, 460 P.3d at 720.  The same is true here.  The prosecutor's comment compared the statements Mr. Ridinger made to the detective and Mr. Schnitker's trial testimony with the physical evidence (SW's cervical swabs) and noted the inconsistencies.

[¶41]   With respect to the comment that "the only explanation as to why [Mr. Ridinger]'s seminal fluid was found in the victim's cervix has come from [SW]'s testimony, and nobody else who has testified here today," it is "generally not error for the prosecutor to argue that [the State's] evidence is uncontradicted or that the evidence does not support the defendant's theory of the case." *Guy v. State*, 2008 WY 56, ¶ 14, 184 P.3d 687, 693 (Wyo.

11

2008) (quoting *Belden v. State*, 2003 WY 89, ¶ 48, 73 P.3d 1041, 1089 (Wyo. 2003)). *See also, Proffit v. State*, 2008 WY 114, ¶ 31, 193 P.3d 228, 240-41 (Wyo. 2008) ("[A] prosecutor may point out that certain evidence is uncontroverted, or that there is no evidence on a certain point."). Mr. Ridinger tells us, however, it is error for a prosecutor to claim the State's evidence is "uncontradicted" "if the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself." *United States v. Robinson*, 651 F.2d 1188, 1197 (6ᵗʰ Cir. 1981) (quoting *United States v. Hardman*, 447 F.2d 853 (7ᵗʰ Cir. 1971)). *See also, United States v. Cotnam*, 88 F.3d 487, 497 (7ᵗʰ Cir. 1996) (A prosecutor's comment that the government's evidence on an issue is "uncontradicted," "undenied," "unrebutted," "undisputed," etc., will be a violation of the defendant's Fifth Amendment rights if the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself." (citations omitted)). According to him, the prosecutor's comment that only SW explained why Mr. Ridinger's semen was found on her cervix effectively told the jury the State's evidence was uncontradicted and improperly emphasized his failure to testify because he and SW were "the only two people who could testify with certainty how Mr. Ridinger's semen got to [SW]'s cervix."

[¶42]  This case is distinguishable from the federal cases relied upon by Mr. Ridinger. In *Robinson*, the appellate court found the prosecutor had not improperly commented on the defendant's right to remain silent. *Robinson*, 651 F.2d at 1198. In *Cotnam* and *Hardman*, the defendant did not testify nor were his statements to law enforcement introduced at trial. *Cotnam*, 88 F.3d at 497-99; *Robinson*, 651 F.2d at 1196-97; *Hardman*, 447 F.2d at 855. Moreover, in those cases, the defendant was the only individual who could have rebutted the government's uncontradicted evidence. *Cotnam*, 88 F.3d at 499; *Hardman*, 447 F.2d at 855. In this case, Mr. Schnitker was also present during the sexual assault and could have provided an explanation as to how Mr. Ridinger's semen ended up inside SW. Instead, he testified only that he observed SW performing oral sex on Mr. Ridinger. *See Guy*, ¶ 16, 184 P.3d at 693 (distinguishing *Cotnam* because although Mr. Guy might have contradicted the eyewitness testimony had he testified, "he was not the only person who could have done so" as several individuals witnessed the offense and Mr. Guy had, in fact, called two witnesses who both contradicted portions of the State's version of events); *Brown v. State*, 92 S.W.3d 655, 666-67 (Tex. App. 2002), *aff'd*, 122 S.W.3d 794 (Tex. Crim. App. 2003) (prosecutor's argument that "there is no disputing . . . [Mr.] Brown intentionally caused the death of . . . Theron Gray" did not improperly comment on Mr. Brown's failure to testify because Mr. Brown was not the only person who could counter the State's evidence of his intent; indeed, other witnesses had testified concerning Mr. Brown's words and actions, which was evidence of his intent).

[¶43]  Mr. Ridinger has failed to show the prosecutor's statements during closing argument violated a clear and unequivocal rule of law in a clear and obvious way. Because he cannot satisfy the second prong of plain error review, we need not address the third prong of plain error review.

## CONCLUSION

[¶44] The State's delay in bringing charges against Mr. Ridinger did not violate due process, and Mr. Ridinger has failed to show the prosecutor's comments during closing argument constituted plain error.

[¶45] We affirm.