# IN THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 36

### APRIL TERM, A.D. 2023

### April 21, 2023

RONALD LEROY KING,

Appellant
(Defendant),

v.

S-22-0190

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
The Honorable Stuart S. Healy III, Judge

*Representing Appellant:*
Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1] A jury found Ronald Leroy King guilty of immodest, immoral, and indecent liberties with a minor, third-degree sexual assault, and first-degree sexual abuse of a minor. He argues the State presented insufficient evidence at trial to support his third-degree sexual assault conviction and prosecutorial misconduct permeated the trial. We affirm.

## ISSUES

[¶2] Mr. King raises two issues which we restate as four:

1.      Was the evidence presented at trial sufficient to show he committed third-degree sexual assault on or between December 2000 and February 2001?

2.      Did the district court commit evidentiary error at trial?

3.      Did prosecutorial misconduct deprive him of a fair trial?

4.      Did cumulative error deprive him of a fair trial?

## FACTS

[¶3] MI and JC are sisters. They grew up in Gillette with their father, MC, and mother, TC, who were best friends with Mr. King and his wife (now ex-wife), Diane King, n/k/a Diane Riley (Ms. King). MI and JC called the Kings "Uncle Ron" and "Aunt Diane."

[¶4] In 1999, when MI was 9 years old and Mr. King was 48 years old, MI would sometimes spend the night at the Kings' house on Greensburgh Avenue in the Sleepy Hollow subdivision. At first, Mr. King treated MI "really well," buying her candy and renting the newest video games and movies for her to play and watch. He eventually began sitting on the Kings' fireplace with his sweatpants pulled down, exposing his penis to MI. One night, when she was 11 years old, MI was laying on the Kings' green couch watching a movie. Mr. King crawled behind her and placed her hand on his "hard" penis for a couple of minutes. Mr. King's breath smelled like cigarettes and cinnamon coffee, which made MI "sick." Mr. King told MI not to tell anyone what had happened, "it was our secret," and "[j]ust remember, I know where you live." MI did not tell anyone about the abuse. In March or April 2001, the Kings moved to Michigan.

[¶5] In April or May 2007, the Kings returned to Gillette and lived with MI and JC's family for a few months. One day, while MI was making a sandwich in the kitchen, Mr. King came into the kitchen, cornered MI, got down on his knees, placed his face into MI's "crotch," and whispered "[o]ne day this is going to be mine." Mr. King stood up, grabbed MI's hand, and placed it on his clothed penis. MI ran away crying and called a friend to

1

pick her up. Again, MI did not tell anyone what happened. The Kings moved out of MI's and JC's home to a townhome on Oregon Avenue in the Westover subdivision.

[¶6]   Later that summer, JC, then 12 years old, went to the Kings' townhome to babysit their grandchildren who were visiting for the summer. When JC and Mr. King (then about 56 years old) were sitting at the dining room table, Mr. King leaned over and told JC, "it would make him pleasurable if he could get [her] wet." Later, while JC was laying on the Kings' couch, Mr. King crawled over her and pulled her pants down. He "rough[ly]" shoved two of his fingers inside her vagina and moved them in and out. Mr. King told her if she told anyone about the abuse, he would kill her. JC told her parents, but they did not believe her.

[¶7]   Twelve years later, in September 2019, Ms. King called MI and asked her if Mr. King had ever touched her. MI broke down crying and told Ms. King that was the reason she stopped going to the Kings' house. MI called JC, who said Mr. King had also sexually abused her. MI and JC reported the abuse to Troy Hipsag, an investigating officer with the Campbell County Sheriff's Office.

[¶8]   Officer Hipsag and his supervisor, Sergeant Janaia Hyland, interviewed Mr. King. Mr. King denied all wrongdoing. However, each time he was confronted with the accusations against him, Mr. King leaned in and said, "I'm sorry, I didn't [or can't] hear you." He never had any difficulty hearing the officers except when asked about the abuse. Mr. King confirmed to the officers "he had a taste for cinnamon" and "sometimes put cinnamon in [his] coffee."

[¶9]   The State charged Mr. King with: (a) three counts of taking immodest, immoral, or indecent liberties (indecent liberties) with a child in violation of Wyo. Stat. Ann. § 14-3-105(a) (repealed in 2007) for exposing his penis to MI "[o]n or between November 1999 [and] February 2001," placing his face into MI's clothed pubic area "[o]n or between May 2007 [and] September 2007," and forcing MI to touch his clothed penis "[o]n or between May 2007 [and] September 2007"; (b) one count of third-degree sexual assault in violation of Wyo. Stat. Ann. § 6-2-304(a)(ii) (repealed in 2007) for forcing MI to touch/stroke his penis "[o]n or between December 2000 [and] February 2001"; and (c) one count of first-degree sexual abuse of a minor in violation of Wyo. Stat. Ann. § 6-2-314(a)(i) (LexisNexis 2021) for digitally penetrating JC's vagina "[o]n or between July 14, 2007 [and] September 1, 2007."[1] At the close of the State's trial evidence, the district court granted Mr. King's motion for judgment of acquittal on the two indecent liberties counts relating to his placing his face into MI's clothed pubic area and forcing her to touch his clothed penis on or

---

[1] The State also charged Mr. King with second-degree sexual abuse of a minor and promoting obscenity relating to a third minor victim. Prior to trial, the district court granted the State's motion to dismiss these counts; they are not before us.

between May 2007 and September 2007.[2]  The jury found him guilty of the remaining counts.  The court sentenced Mr. King to 8-10 years in prison on the indecent liberties conviction (exposing his penis to MI on or between November 1999 and February 2001), a concurrent sentence of 12-15 years in prison on the third-degree sexual assault conviction (forcing MI to touch/stroke his penis on or between December 2000 and February 2001), and a consecutive sentence of 25-30 years imprisonment on the first-degree sexual abuse of a minor conviction (digitally penetrating JC's vagina on or between July 14, 2007, and September 1, 2007).  Mr. King timely appealed.

## DISCUSSION

### A.  Sufficiency of the Evidence

[¶10]  When reviewing whether a conviction is supported by sufficient evidence,

> "we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt."  *Roman v. State*, 2022 WY 48, ¶ 9, 507 P.3d 453, 456 (Wyo. 2022) (quoting *Regan v. State*, 2015 WY 62, ¶ 10, 350 P.3d 702, 705 (Wyo. 2015)).  "We 'examine[ ] the evidence in the light most favorable to the State.'"  *Barrett v. State*, 2022 WY 64, ¶ 20, 509 P.3d 940, 945 (Wyo. 2022) (quoting *Cotney v. State*, 2022 WY 17, ¶ 9, 503 P.3d 58, 63 (Wyo. 2022)).  "We accept all evidence favorable to the State as true and give the State's evidence every favorable inference which can reasonably and fairly be drawn from it."  *Id*. (quoting *Cotney*, ¶ 9, 503 P.3d at 63).  "We also disregard any evidence favorable to the appellant that conflicts with the State's evidence."  *Id*. (quoting *Cotney*, ¶ 9, 503 P.3d at 63).  "We do not reweigh the evidence or reexamine the credibility of the witnesses."  *Latham v. State*, 2021 WY 29, ¶

---

[2] These indecent liberties counts were charged under § 14-3-105(a) and were alleged to have occurred on or between May 2007 and September 2007.  On July 1, 2007, the Wyoming legislature repealed § 14-3-105(a) and moved the prohibition on taking indecent liberties with a child to Wyo. Stat. Ann. § 6-2-316(a)(iv) (LexisNexis 2021).  Unlike § 14-3-105(a) which applied to a victim under the age of 18, § 6-2-316(a)(iv) requires the defendant to be 17 years of age or older and the victim to be less than 17 years old and four years younger than the defendant.  The district court decided the jury would have to find whether the alleged abuse occurred between May 2007 and June 30, 2007, or between July 1, 2007, and September 2007, to determine which statute applied and then find whether the State had provided sufficient evidence establishing the elements of the pertinent statute.  After hearing the State's evidence, the district court determined the jury could not find beyond a reasonable doubt that these indecent liberties offenses occurred "either prior to June 30th of 2007 or on July 1st of 2007 or after" and granted Mr. King's motion for judgment of acquittal as to these counts.

3

6, 480 P.3d 527, 530 (Wyo. 2021) (quoting *Armajo v. State*, 2020 WY 153, ¶ 21, 478 P.3d 184, 191 (Wyo. 2020)).

*Ogden v. State*, 2022 WY 111, ¶ 13, 516 P.3d 870, 874 (Wyo. 2022).

[¶11]   The State charged Mr. King with committing third-degree sexual assault by forcing MI to touch/stroke his penis "on or between December 2000 [and] February 2001."  The district court instructed the jury that to find Mr. King guilty of third-degree sexual assault, it had to find beyond a reasonable doubt, *inter alia*, the assault occurred "[o]n or between December 2000 and February 2001."  The jury was also told:  "The . . . Information charging [Mr. King] with the commission of the alleged offenses states that the crimes occurred 'on or between' certain dates.  The State must prove beyond a reasonable doubt that the crimes alleged occurred approximately on or between the dates stated.  It is not necessary that the State prove the crimes to have occurred specifically on a particular date to the exclusion of all other dates."

[¶12]   Mr. King argues the trial evidence was insufficient to establish he forced MI to touch/stroke his penis on or between December 2000 and February 2001 because MI testified on direct examination and confirmed on cross examination that this incident occurred in 1999 when she was 9 years old.  Mr. King accurately recounts MI's testimony on direct and cross examination.  However, MI clarified on re-direct that Mr. King forcing her to touch/stroke his penis could have occurred between December 2000 and February 2001 when she was 11 years old.  Mr. King acknowledges MI's testimony on re-direct but claims we cannot rely on it because to do so would require us to completely disregard her testimony on direct.  According to him, "[b]oth cannot hold true at the same time—that the State's evidence in direct was true, and the State's evidence in redirect was true."

[¶13]   MI's testimony on direct and cross examination was inconsistent with her re-direct testimony.  Such inconsistency is not surprising given MI's young age at the time of the abuse and the lapse of over twenty years between the abuse and the March 2022 trial.  *Cf. Craft v. State*, 2013 WY 41, ¶ 25, 298 P.3d 825, 832 (Wyo. 2013) ("There is no doubt there were inconsistencies in AXC's and PC's testimony regarding the time of the abuse.  As we have recognized before, such inconsistencies are not uncommon or unexpected for young victims of abuse.").  Any inconsistency, however, was for the jury to resolve.

> We have consistently held that the question of credibility of witnesses rests with the trier of fact, *Montez v. State*, Wyo., 527 P.2d 1330, 1332 (1974); *Janski v. State*, Wyo., 538 P.2d 271, 277 (1975), and this determination will not be disturbed on appeal.  *Brown v. State*, Wyo., 581 P.2d 189, 191 (1978). There is no rule of law that we are aware of that says that a fact finder must believe or disbelieve anyone.  *In fact, the trier of fact is free to accept all, part or none of the evidence offered*

*by a witness.  Hopkinson v. State*, Wyo., 632 P.2d 79, 148 (1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Clegg v. State*, Wyo., 655 P.2d 1240, 1242 (1982).

*Simmons v. State*, 687 P.2d 255, 258 (Wyo. 1984) (emphasis added).  *See also, Fortner v. State*, 843 P.2d 1139, 1149 (Wyo. 1992) ("Since Myers' testimony was the only direct evidence linking Appellant to the sale [of methamphetamine], Appellant argues that there was insufficient evidence for his conviction.  However, the inconsistencies and memory gaps in Myers' testimony were relevant to his credibility, which was for the jury to determine rather than for this Court.") (citation omitted).  The jury in this case was free to accept MI's re-direct testimony over her testimony on direct and cross examination, and her testimony on re-direct was sufficient evidence showing Mr. King forced MI to touch/stroke his penis "on or between December 2000 and February 2001."

[¶14]  MI's re-direct testimony concerning the dates Mr. King forced her to touch/stroke his penis was consistent with the information she relayed to Officer Hipsag during her interview in September 2019.  When describing MI's demeanor throughout the interview, Officer Hipsag told the jury MI was "distraught as she recalled the events that happened to her when she was *9 years old, 11 years old, and 16 years old*."  (Emphasis added).  During trial, the State generally referred to Mr. King exposing his penis to MI as the first incident, forcing her to touch/stroke his penis as the second incident, and placing his face into her clothed pubic area and making her touch his clothed penis collectively as the third incident.  Given these references, a reasonable jury could have determined Mr. King exposed himself to MI when she was 9 years old, forced her to touch/stroke his penis when she was 11 years old, and placed his face into her clothed pubic area and made her touch his clothed penis when she was 16 years old.  MI testified she was born in 1990, which is consistent with her being 11 years old in 2001.

[¶15]  The trial evidence was sufficient to establish Mr. King forced MI to touch/stroke his penis "on or between December 2000 and February 2001."

## B.  Evidentiary Error

[¶16]  Mr. King argues the prosecutor committed misconduct when he (1) introduced Wyoming Rule of Evidence (W.R.E.) 404(b) evidence without providing pretrial notice of the State's intent to introduce such evidence; (2) referred to the conduct underlying the dismissed charges during closing argument; and (3) attempted to elicit expert testimony from Sergeant Hyland in violation of the district court's Criminal Case Management Order.  Prosecutorial misconduct is "'[a] prosecutor's improper or illegal act (or failure to act), esp[ecially] involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'"  *Craft*, ¶ 13, 298 P.3d at 829 (quoting *Black's Law Dictionary* 1237 (7th ed. 1999)).  "Prosecutorial misconduct claims are not intended to provide an avenue for tactical sandbagging of the trial courts, but rather, to address gross

prosecutorial improprieties that have deprived a criminal defendant of his or her right to a fair trial." *McGinn v. State*, 2015 WY 140, ¶ 49, 361 P.3d 295, 306 (Wyo. 2015) (Fox, J., concurring) (quoting 21 Am. Jur. 2d *Prosecutorial Misconduct* § 429, at 545 (2008)). A prosecutor's conduct is not misconduct unless he "knew or should have known [it] would deprive the defendant of the right to a fair trial[.]" *Id.*, ¶¶ 51-52, 361 P.3d at 306-07 (providing a non-exhaustive list of the types of conduct we have found to constitute prosecutorial misconduct). *See also, Klingbeil v. State*, 2021 WY 89, ¶ 54, 492 P.3d 279, 290 (Wyo. 2021) (Kautz, J., concurring). It "is something more than evidentiary error[.]" *McGinn*, ¶ 50, 361 P.3d at 306 (Fox, J., concurring) (citations omitted). "We . . . distinguish prosecutorial misconduct from evidentiary error because otherwise, 'any evidentiary error which favors the State would be considered prosecutorial misconduct.'" *Dixon v. State*, 2019 WY 37, ¶ 37, 438 P.3d 216, 231 (Wyo. 2019) (quoting *Craft*, ¶ 13, 298 P.3d at 829).

[¶17]   The above complaints do not rise to the level of prosecutorial misconduct because there is no indication the prosecutor acted or failed to act to deprive Mr. King of a fair trial. As a result, we will analyze them for what they are—alleged evidentiary errors. *See Mendoza v. State*, 2016 WY 31, ¶ 21, 368 P.3d 886, 894 (Wyo. 2016) (analyzing the prosecutor's introduction of photographs of the victims as evidentiary error because it did not rise to the level of prosecutorial misconduct).

### *Rule 404(b)—Multiple Exposure Evidence*

[¶18]   The affidavit of probable cause stated MI estimated Mr. King had "exposed himself to her 100 times." The State, however, charged Mr. King with only one count of exposing his penis to MI. Despite Mr. King twice filing a pretrial demand for notice of the State's intent to introduce Rule 404(b) evidence, the State never provided notice. During his opening statement, the prosecutor told the jury MI would testify that Mr. King exposed his penis to her "approximately a hundred times." After the prosecutor finished his opening statement, Mr. King moved for a mistrial, claiming the prosecutor's statement referred to Rule 404(b) evidence and he was not provided pretrial notice of the State's intent to introduce such evidence. The district court agreed the prosecutor's comment referenced Rule 404(b) evidence and concluded MI could not testify that Mr. King exposed his penis to her a hundred times because the State never provided Mr. King pretrial notice of its intent to introduce that evidence. The court denied, however, Mr. King's motion for a mistrial because it had instructed the jury at the beginning of the trial that the attorneys' comments during opening statements were not evidence. Mr. King declined the court's offer to re-read that instruction to the jury.

[¶19]   Mr. King claims the prosecutor erred by referring to evidence that he exposed his penis to MI approximately a hundred times because such evidence constitutes other bad acts evidence under Rule 404(b) and the prosecutor failed to provide pretrial notice of the State's intent to introduce that evidence at trial. "When a trial objection is considered by the district court, we review its rulings on the admissibility of evidence for an abuse of

6

discretion." *Triplett v. State*, 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017). "Similarly, 'we review the denial of a motion for mistrial for an abuse of discretion.'" *Id.*, ¶ 24, 406 P.3d at 1262 (quoting *Yellowbear v. State*, 2008 WY 4, ¶ 66, 174 P.3d 1270, 1295 (Wyo. 2008)) (other citations omitted). "'A trial court abuses its discretion when it could not have reasonably concluded as it did.'" *Hodge v. State*, 2015 WY 103, ¶ 8, 355 P.3d 368, 371 (Wyo. 2015) (quoting *Bromley v. State*, 2007 WY 20, ¶ 8, 150 P.3d 1202, 1206-07 (Wyo. 2007)).

[¶20] Rule 404(b) states in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" "Because of the inherent danger for prejudice associated with [Rule 404(b)] evidence, there is a mandatory procedure that must be followed before that evidence may be admitted. . . ." *Birch v. State*, 2018 WY 73, ¶ 19, 421 P.3d 528, 535 (Wyo. 2018) (citing *Gleason v. State*, 2002 WY 161, ¶ 18, 57 P.3d 332, 340 (Wyo. 2002)). Under that procedure, once a defendant files a pretrial demand for notice of the State's intent to introduce Rule 404(b) evidence, the State must identify the evidence and the district court must hold a hearing and conduct an "'exacting analysis" (often referred to as a *Gleason* analysis) of the following factors:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted."

*Id.* (quoting *Lindstrom v. State*, 2015 WY 28, ¶ 21, 343 P.3d 792, 798 (Wyo. 2015), and *Gleason*, ¶ 18, 57 P.3d at 340).

[¶21] The State does not dispute evidence that Mr. King exposed himself to MI approximately a hundred times falls within the scope of Rule 404(b). It also concedes that upon the filing of Mr. King's demands for notice of the State's intent to introduce Rule 404(b) evidence, the prosecutor was obligated to identify this evidence so the district court could hold a hearing and perform a *Gleason* analysis. The State argues, however, that the error did not warrant a mistrial and the district court properly exercised its discretion by denying Mr. King's motion for a mistrial.

[¶22] "'[G]ranting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial.'" *McGill v. State*, 2015 WY 132, ¶ 11, 357 P.3d 1140, 1145 (Wyo. 2015)

(quoting *Warner v. State*, 897 P.2d 472, 474 (Wyo. 1995)). To determine whether an error is "so prejudicial" as to warrant a mistrial, we consider the severity and pervasiveness of the error and the curative actions taken by the district court. *McGill*, ¶ 12, 357 P.3d at 1145. *See also, Salinas v. State*, 2016 WY 97, ¶ 17, 380 P.3d 647, 650 (Wyo. 2016). "'The trial court is in the best position to assess the prejudicial impact of [the] error.'" *McGill*, ¶ 11, 357 P.3d at 1145.

[¶23] The district court reasonably concluded the prosecutor's comment that MI would testify Mr. King exposed himself to her "approximately a hundred times" was not so prejudicial as to warrant a mistrial. The objectionable comment consisted of a single sentence in the State's five-page opening statement and in a three-day trial. Although the court did not strike the comment, it took appropriate curative action by prohibiting MI from testifying that Mr. King exposed his penis to her a hundred times. It had also just instructed the jury that "as to any statement made by counsel in [the jury's] presence concerning the facts of the case, [the jury] must not regard such a statement as evidence[.]" While Mr. King declined the court's offer to remind the jury of this instruction at the time he moved for a mistrial, the court re-read the instruction to the jury at the close of the evidence. We presume the jury followed this instruction and did not consider the prosecutor's comment as evidence. *McGill*, ¶ 12, 253 P.3d at 1145; *Salinas*, ¶ 17, 380 P.3d at 650.

### *Rule 404(b) – Threat Evidence*

[¶24] During the State's case-in-chief, JC described the abuse Mr. King inflicted upon her. The prosecutor then asked her if Mr. King said anything to her during the abuse. JC responded: "He said if I was to tell anybody, he would kill me." During closing argument, the prosecutor told the jury, "[JC] recounted that every time she saw Ronald King he would tell her, 'If you ever tell, I'll kill you.'"

[¶25] Mr. King argues it was error to introduce evidence that he threatened JC because such evidence constitutes Rule 404(b) evidence and the prosecutor failed to provide pretrial notice of the State's intent to introduce that evidence at trial. Again, the State does not dispute that the threat evidence falls within the scope of Rule 404(b) and, upon Mr. King's filing of the pretrial demands for notice of Rule 404(b) evidence, the prosecutor should have identified this evidence so the district court could hold a hearing and analyze the evidence under *Gleason*. Nevertheless, while it concedes error, it maintains Mr. King was not prejudiced by the admission of the threat evidence.

[¶26] Mr. King filed a pretrial demand for notice of the State's intent to introduce Rule 404(b) evidence; as a result, our review is for an abuse of discretion. *Hodge*, ¶ 8, 355 P.3d at 370-71(citations omitted). *See also, Winters v. State*, 2019 WY 76, ¶ 79, 446 P.3d 191, 215 (Wyo. 2019) ("Because Mr. Winters' pretrial demand for notice of Rule 404(b) evidence properly preserved his arguments for appeal, our review is for an abuse of discretion." (citing *Mayhew v. State*, 2019 WY 38, ¶ 23, 438 P.3d 617, 623 (Wyo. 2019))).

However, since "it remains difficult, if not impossible, to apply the abuse of discretion standard where[, as here,] a 404(b) issue [was] not squarely brought to the trial court for a full and timely *Gleason* hearing, our decision turns on whether Mr. [King] was prejudiced." *Vinson v. State*, 2020 WY 93, ¶ 24, 467 P.3d 1009, 1014 (Wyo. 2020) (citation omitted). We will address whether Mr. King was prejudiced when discussing his cumulative error argument below.

### *Dismissed Charges*

[¶27] As we noted above, the district court granted Mr. King's motion for judgment of acquittal with respect to the indecent liberties counts relating to his placing his face into MI's clothed pubic area and forcing her to touch his clothed penis. During closing argument, the prosecutor argued: "[Officer Hipsag] told you when [MI] was 16 when she was in the kitchen when Ronald King cornered her . . . , he got on his knees, stuck his face in her crotch." He also stated: "When [Mr. King] stuck his face in [MI's] crotch, she was scared and frozen with fear. You heard her tell you that she got sick to her stomach, started crying, calling a friend to pick her up." The prosecutor reminded the jury that MI testified Mr. King told her: "'I know where you live. This is our little secret.'" Mr. King asserts the district court erred by allowing the prosecutor to refer to the dismissed charges during closing argument. The State argues we should not consider this argument because Mr. King waived it in a conference with the district court where the closing argument was specifically addressed.

[¶28] "When a party affirmatively waives a right or objection, we do not review it; however, when a party merely forfeits a right or objection, we review for plain error." *Mackley v. State*, 2021 WY 33, ¶ 11, 481 P.3d 639, 642 (Wyo. 2021) (citing *Jackson v. State*, 2019 WY 81, ¶ 9, 445 P.3d 983, 987 (Wyo. 2019)). Waiver is the "'intentional relinquishment or abandonment of a known right'"; it "requires something more affirmative than simple agreement." *Id*., ¶ 13, 481 P.3d at 643 (quoting *Jackson*, ¶ 9, 445 P.3d at 987) (other citation omitted). Forfeiture, on the other hand, "is the failure to make a timely assertion of a right." *Id.,* ¶ 11, 481 P.3d at 643 (citing *Jackson*, ¶ 9, 445 P.3d at 987).

[¶29] After the State's closing argument and outside the hearing of the jury, the district court noted the prosecutor's reference to the dismissed charges and instructed the prosecutor not to refer to them in rebuttal. Although the prosecutor stated he would not further reference the dismissed charges, defense counsel said he had no objection to the prosecutor's use of them in closing argument because they "were testified to in court" and "fair game for both parties." He also stated he "certainly" was going "to bring up the discrepancy in dates" concerning the dismissed charges during his closing argument and, in fact, did so. Defense counsel told the jury that MI testified on direct examination the kitchen incident occurred in 2006 and confirmed on cross examination she was "a hundred percent sure" it occurred in 2006. Yet, he pointed out, MI agreed with the prosecutor

9

during re-direct examination "that it was 2007[,] [i]t could have been 2007[,] [m]aybe 2007." Defense counsel argued the date was important because Mr. King did not live in Gillette in 2006. He then relied on MI's inconsistent testimony concerning when the abuse underlying the dismissed charges occurred, as well as her and JC's inconsistent testimony as to when the other abuse occurred, to argue the State had not met its burden of showing beyond a reasonable doubt when any of the abuse occurred. Defense counsel made a strategic choice to relinquish any right Mr. King had to object to the prosecutor's reference to the dismissed charges. We will not allow Mr. King to turn this trial strategy into an appellate error. *Tarpey v. State*, 2023 WY 14, ¶ 50, 523 P.3d 916, 931 (Wyo. 2023) ("We reject attempts by a defendant to turn a trial strategy into an appellate error." (quoting *Mackley*, ¶ 11, 481 P.3d at 642)) (other citation omitted). Because Mr. King waived his argument regarding the prosecutor's reference to the dismissed charges during closing argument, we do not consider it.

### *Violation of Criminal Case Management Order/Expert Testimony*

[¶30] During direct examination, the prosecutor asked Sergeant Hyland if "in [her] training and experience with child sexual assault cases," delayed disclosures by victims are uncommon. She replied, "No, they're very common." He then asked her: "Would you say that disclosures are a process, not an event?" Defense counsel objected, arguing the question called for expert testimony. The prosecutor claimed that although Sergeant Hyland had not been designated as an expert, he believed the testimony was proper given her training and experience. The district court sustained the objection because the question was leading. It also determined it called for expert testimony and Sergeant Hyland had not been designated as an expert.

[¶31] Mr. King argues that, by asking Sergeant Hyland about whether disclosures of sexual abuse are a process or an event, the prosecutor improperly elicited expert testimony without disclosing it in accordance with the district court's Criminal Case Management Order. The Criminal Case Management Order did not require designation of "expert" witnesses, but only required a listing of witnesses. The State properly listed Sergeant Hyland as a witness. Mr. King's argument that the prosecutor violated the court's Criminal Case Management Order is simply incorrect. Mr. King's argument that Sergeant Hyland was not shown to be an expert who could testify regarding disclosures of sexual abuse is an argument that her testimony lacked foundation. *See Esquibel v. State*, 2022 WY 89, ¶ 20, 513 P.3d 148, 152 (Wyo. 2022) ("Mr. Esquibel's argument that Officer Zwiebel was not shown to be an expert and that his opinion was not supported by sufficient facts and was otherwise unreliable is an argument that Officer Zwiebel's testimony lacked foundation.") (collecting cases). Because Mr. King did not specifically object at trial to Sergeant Hyland's testimony on the basis of inadequate foundation, we normally would not consider this issue. *Mayhew*, ¶ 54, 438 P.3d at 634 ("[O]bjections based on the adequacy of foundation must be made when the evidence is offered, and the failure to make a timely objection will preclude appellate review."). Even considering it, however, we see

no abuse of discretion because the district court sustained Mr. King's objection to the prosecutor's question and Sergeant Hyland did not answer the question or testify further on the matter. Mr. King does not argue the district court abused its discretion and concedes "the district court's ruling on [his] objection isolated what could have been extensive improper testimony elicited by the State without prior disclosure[.]" Nevertheless, he contends we should consider this incident when addressing his cumulative error argument. As we explain below, when performing a cumulative error analysis, "'we consider only matters that were determined to be errors, and not any matter assigned as error but determined not to be erroneous.'" *Hicks v. State*, 2021 WY 2, ¶ 40, 478 P.3d 652, 663 (Wyo. 2021) (quoting *Sweet v. State*, 2010 WY 87, ¶ 40, 234 P.3d 1193, 1207 (Wyo. 2010)) (other citation omitted). Because there was no error, we will not consider this issue when addressing Mr. King's cumulative error argument.

## C. *Prosecutorial Misconduct*

[¶32] Mr. King argues the prosecutor committed misconduct by (1) eliciting victim impact testimony during the State's case-in-chief and referring to that testimony during closing and rebuttal argument; (2) opining on the veracity and truthfulness of the witnesses during closing and rebuttal argument; and (3) encouraging the jury to convict Mr. King to protect the community rather than on the evidence.

[¶33] Mr. King concedes plain error review applies because he did not lodge a prosecutorial misconduct objection at trial. *Ridinger v. State*, 2021 WY 4, ¶ 32, 478 P.3d 1160, 1168 (Wyo. 2021) ("[B]ecause Mr. Ridinger did not object to the prosecutor's comments at trial, the plain error standard applies." (citing *Dixon*, ¶ 39, 438 P.3d at 231)) (other citation omitted). To establish plain error, Mr. King "must show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice." *Id.*, ¶ 33, 478 P.3d at 1168 (citing *Mraz v. State*, 2016 WY 85, ¶ 55, 378 P.3d 280, 293 (Wyo. 2016)). Because the record clearly reflects each of the alleged incidents of prosecutorial misconduct, the first prong of plain error review is satisfied. We now turn to whether Mr. King has established the second prong of plain error review with respect to each alleged incident of misconduct, reserving our discussion of the third prong of plain error review for our analysis of Mr. King's cumulative error argument.

### *Victim Impact Evidence*

[¶34] At trial, the prosecutor asked MI how Mr. King's abuse affected her. MI responded she became rebellious, dropped out of high school, and started to drink. She testified the abuse caused her long-term depression and anxiety and she does not like to be in places alone or with men. She also stated the abuse affected how she parents her children: "I don't let my kids stay the night at people's houses, I keep them close to me at all times just so that I can make sure that they're safe." The prosecutor also asked JC how Mr. King's

11

abuse affected her. She responded: "I became very socially awkward. I stay at home all the time. I don't go out without somebody with me." She confirmed she has "trust issues" and there was a period of time where she would not let TC do her laundry. When asked why she would not let TC do her laundry, JC explained: "Because cleaning gave me . . . peace of mind, took me to a place where I was relaxed." She stated she was still "obsessive about cleaning" and "still scared of Ronald King." On re-direct examination, JC admitted she was "scared to death" to be in the courtroom and was "shaking" when she came into the courtroom.

[¶35] The prosecutor asked TC to describe her daughters "pre-Ron King," i.e., prior to the abuse. TC responded, "they were full of life," "joyful," "happy," "well-rounded" and "did very well [in school]." In contrast, when asked what they were like "post-Ron King," i.e., after the abuse, TC testified MI became withdrawn and closed off, did not want to go anywhere or spend time with her friends, and "went inside herself." She stated JC "stopped smiling[,]" "wasn't joyful anymore[,]" "went into herself[,]" "didn't interact with people around her," "would hide[,]" and "didn't want to do anything anymore." She testified both girls' grades dropped after the abuse. TC confirmed that when JC was around 13 years old, JC demanded TC not do JC's laundry. She also confirmed that after the abuse JC became obsessed with cleaning. TC testified she did not remember JC telling her about the abuse, but she did "have feelings of guilt." On re-direct, TC said JC had been more "profoundly affected" by Mr. King's abuse than MI.

[¶36] During closing argument, the prosecutor told the jury:

> [MI] described to you how [Mr. King] laid down behind her, put her hand on his erect penis, moving it up and down. The unforgettable smell of cinnamon coffee and cigarettes; a smell which haunts her to this day . . . .

He also recounted the threats Mr. King made to JC and argued the following:

> I submit to you, ladies and gentlemen, that fear, that terror survives today. I don't know in my 39 years of practicing law that I've ever seen such raw fear and terror in my entire life.
> [JC] told you that she did go back over to the Kings', but she always brought a friend.
> Folks, you can't make up that fear, that raw emotion, that terror. You saw how emotionally distraught [JC] was seeing King and recounting the trauma inflicted upon her by Ronald King. She remembers this incident happening in the summer of 2007 while baby-sitting the Kings' grandchildren. She did the best she could to recount the time. Her birthday

12

was July 14th. We believe we got there; it took a little bit, but I think we were there. That was 15 or so years ago. And if you think that was easy, no, it wasn't. I submit to you, ladies and gentlemen, that coming here, bearing her soul to you, re-traumatized her. She relieved [sic] it yesterday. Look what he did to her.

He also told the jury:

Folks, these girls bared their soul to you, they faced their fears. [JC] was more telling; you saw how this has affected her profoundly. Profoundly. Do you think disclosing was easy? Do you think disclosing sexual abuse was easy? It's not an event, it's a process. It's not always chronological. You're going to get bits and pieces over a period of time for many reasons, but that's our job to sort it out.

[¶37] In rebuttal, the prosecutor told the jury:

[T]ake [MI's and JC's] trauma into consideration. And we have the right to rehabilitate a witness. Some people are not sure. Some people are petrified, terrorized. Take that into consideration.

Yeah, [TC] had a hard time remembering, but I think that for the most part she got it right. She also told you that in retrospect looking back, she has guilt, and that guilt is going to stay with her for the rest of her life.

[¶38] Mr. King argues the above testimony and argument constituted improper victim impact evidence and argument. "Broadly speaking, victim impact evidence is that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and on the victim's family." *Smith v. State*, 2005 WY 113, ¶ 15, 119 P.3d 411, 416 (Wyo. 2005) (citing *Olsen v. State*, 2003 WY 46, ¶ 151, 67 P.3d 536, 592 (Wyo. 2003), and *Harlow v. State*, 2003 WY 47, ¶ 48, 70 P.3d 179, 196 (Wyo. 2003)). "Generally, '[t]he testimony of victims of a crime describing how it affected their lives after the crime is irrelevant' with respect to the question of whether a crime has been committed." *Hill v. State*, 2016 WY 27, ¶ 28, 371 P.3d 553, 562 (Wyo. 2016) (quoting *Jensen v. State*, 2005 WY 85, ¶ 16, 116 P.3d 1088, 1094 (Wyo. 2005)) (other citation omitted). Victim impact evidence is also improper if "its only purpose [was] to attempt to arouse the passions of the jury." *Justice v. State*, 775 P.2d 1002, 1010 (Wyo. 1989) ("[Victims'] discussion of the impact of the crime upon them could not in any way serve to establish any of the elements of the crime of aggravated robbery. The only purpose must have been to attempt to arouse the passions of the jury.").

13

[¶39] Victim impact evidence may be relevant, however, for a proper purpose. For example, victim impact evidence is probative as to whether the incident occurred at all because physical or psychological trauma is the natural result of an assault. *See, e.g., Simmons v. State*, 504 N.E.2d 575, 581 (Ind. 1987) (trial court did not abuse its discretion in admitting testimony from victim's father and sister that following rape, victim "became afraid to go outside by herself, stayed home more often, and even feared for other family members who went out alone" as it was probative of the fact that victim had been raped); *Dickerson v. Commonwealth*, 174 S.W.3d 451, 471-72 (Ky. 2005) (evidence of victim's emotional injury, including that she visited a rape crisis center for treatment, was relevant to prove she was sexually assaulted); *State v. Dube*, 598 A.2d 742, 746 (Me. 1991) ("Evidence of changes in the victim's personality and behavior immediately after the time of the reported assault tends to prove that something of a traumatic nature had in fact occurred and thus was clearly relevant to the State's case."); *State v. Seiter*, 949 S.W.2d 218, 223 (Mo. Ct. App. 1997) ("Evidence of physical and psychological changes in the victim is relevant to prove the elements of the sexual offense itself and thus may be admitted to show the offense did in fact occur."); *State v. Cosey*, 873 P.2d 1177, 1181-82 & n.6 (Utah Ct. App. 1994) (testimony of victim's mother contrasting victim's behavior prior to the incident with that after the incident was properly admitted because "[e]vidence of a drastic change in the victim's behavior is relevant circumstantial evidence that a traumatic experience such as rape has occurred"); *State v. Shaw*, 542 A.2d 1106, 1107-08 (Vt. 1987) (victim's friends testimony comparing the victim's behavior before and after the date of the rape was material to whether the rape occurred). Another obvious purpose is to bolster a witness's credibility after it is attacked. *See, e.g., White v. State*, 2003 WY 163, ¶ 20, 80 P.3d 642, 651-52 (Wyo. 2003); *Barnes v. State*, 858 P.2d 522, 534-35 (Wyo. 1993).

[¶40] Mr. King claims the prosecutor's introduction of victim impact evidence and reference to it in closing and rebuttal argument was improper because the effect his abuse had on MI, JC, and TC was not relevant to establishing any of the elements of the crimes nor was it offered as a response to any attack on their credibility. Rather, he asserts the prosecutor elicited the victim impact evidence and relied on it in closing solely to arouse the passions of the jury. We disagree. Placed in its proper context, the victim impact evidence was relevant. It was probative to the questions of whether and when the alleged incidents occurred, and to support the witnesses' credibility.

[¶41] During opening statements, defense counsel told the jury the State's evidence regarding the dates the abuse occurred was "very vague" and there would be no evidence showing the abuse occurred on a specific date. He also claimed the State may have explanations as to why it is missing certain evidence "but the explanation is simple as pie: [The abuse] didn't happen." During cross examination of MI, defense counsel asked her a series of questions regarding when the abuse occurred and the fact that she could not pinpoint an exact date. Similarly, during cross examination of JC, counsel pointed out that

14

she initially testified during direct examination that she could not remember the date or year that Mr. King abused her but eventually agreed with the prosecutor that it occurred in 2007. He then asked JC whether she independently remembered that the abuse occurred in 2007, or whether she was simply agreeing with the prosecutor that it occurred in 2007. JC responded: "I don't know what to say. . . . I don't really know. It's been a long time. I'm sorry, I don't remember. (Cries.) I can't think right now." In closing argument, defense counsel used MI's and JC's inability to recall when the abuse occurred and their inconsistent testimony on the dates to argue the State failed to satisfy its burden of showing Mr. King was guilty beyond a reasonable doubt. He also attacked TC's credibility by arguing to the jury: "Your daughter tells you that she was molested by Uncle Ron, and you don't remember that happening? Both things can't be true. And if someone is willing to fib on that, what else are they willing to fib about? That is reasonable doubt."

[¶42] By eliciting testimony from TC as to what her daughters were like "pre-Ron King" and "post-Ron King," the prosecutor offered evidence probative to the position that "something" indeed happened to them to cause such a drastic change in their personalities and behaviors. Similarly, evidence that MI and JC were traumatized by the abuse and feared Mr. King was probative to the issues of whether any abuse occurred at all and why MI and JC could not recall, or had difficulty recalling, the dates of the abuse. Finally, the prosecutor used TC's testimony that she has "feelings of guilt" over what happened to her daughters to rehabilitate her character after defense counsel faulted her for not remembering whether JC told her about the abuse. Such use of victim impact testimony was proper and did not constitute prosecutorial misconduct.

### *Personal Opinion Regarding Veracity*

[¶43] During the State's closing argument, the prosecutor recounted JC's testimony concerning the abuse and how Mr. King threatened to kill her if she told anyone. The prosecutor then stated, "I submit to you, ladies and gentlemen, that fear, that terror survives today. I don't know in my 39 years of practicing law that I've ever seen such raw fear and terror in my entire life." Mr. King argues this comment constituted an improper opinion on the veracity and truthfulness of the witnesses. The State maintains the comment did not constitute an opinion on MI's and JC's veracity but rather was a proper comment on the state of the evidence, i.e., MI's and JC's fear and terror while testifying.

[¶44] "'Attorneys are afforded wide latitude during closing argument and may comment on evidence admitted during trial and suggest reasonable inferences.'" *Fairbourn v. State*, 2020 WY 73, ¶ 89, 465 P.3d 413, 433 (Wyo. 2020) (quoting *Hartley v. State*, 2020 WY 40, ¶ 13, 460 P.3d 716, 720 (Wyo. 2020)) (other citation omitted). When determining whether a prosecutor committed misconduct during closing arguments, "'we review the entire argument, and do not isolate discrete parts of the argument that may be taken out of context.'" *Id.* (quoting *Larkins v. State*, 2018 WY 122, ¶ 95, 429 P.3d 28, 50 (Wyo. 2018)). "We are reluctant to find plain error in closing arguments 'lest the trial court becomes

required to control argument because opposing counsel does not object.'" *Trujillo v. State*, 2002 WY 51, ¶ 4, 44 P.3d 22, 24 (Wyo. 2002) (quoting *James v. State*, 888 P.2d 200, 207 (Wyo. 1994)) (other citation omitted). Nevertheless, "it is the jury's role to determine the credibility of witnesses" and "a prosecutor cannot personally vouch for the credibility of a state's witness." *Fennell v. State*, 2015 WY 67, ¶ 31, 350 P.3d 710, 722 (Wyo. 2015) (citations omitted). "[I]t is improper for a prosecuting attorney to inject his opinion as to the weight of the evidence in arguing to the jury" because "a prosecutor may be seen as an authority whose opinion carries greater weight than the jury's opinion." *Harper v. State*, 970 P.2d 400, 405 (Wyo. 1998) (citing *McLaughlin v. State*, 780 P.2d 964, 967 (Wyo. 1989), and *Mintun v. State*, 966 P.2d 954, 960 (Wyo. 1998)).

[¶45] MI told the jury she was nervous and scared to testify. JC said she was "scared to death" to testify and "was so petrified" that she was "shaking" when she came into the courtroom. Because MI and JC testified they were scared, the prosecutor could have properly commented on this evidence during his arguments and asked the jury to draw the reasonable inference that this fear explained the inconsistencies in their testimony concerning the dates of the abuse. However, the prosecutor stepped over the line by commenting he had never seen "such raw fear and terror" in his 39 years of practicing law or in his life. By doing so, he personally opined on the veracity of MI's and JC's testimony, thereby invading the province of the jury to weigh the credibility of these witnesses. *Simmons*, 687 P.2d at 258. *See also, Fairbourn,* ¶ 85, 465 P.3d at 432 ("'It is the province of the jury to weigh the credibility of witnesses.'" (quoting *Beaugureau v. State*, 2002 WY 160, ¶ 17, 56 P.3d 626, 636 (Wyo. 2002))).

[¶46] Mr. King also argues the prosecutor improperly opined on the veracity of the witnesses during rebuttal argument when he said: "I interviewed [TC] three times. I talked to [Ms. King] several times." The State maintains this statement did not constitute an opinion on the veracity of TC and Ms. King, and we agree. The prosecutor did not intimate what was said during those interviews, how TC and Ms. King acted during those interviews, or how the fact he interviewed and talked with them made them more credible. Nonetheless, as the State concedes, the prosecutor's statement was improper on a different basis.

[¶47] "It is well-settled law that a prosecutor must restrict his argument to the evidence presented to the jury." *Talley v. State*, 2007 WY 37, ¶ 19, 153 P.3d 256, 262 (Wyo. 2007) (citations omitted). *See also, Black v. State*, 2020 WY 34, ¶ 40, 458 P.3d 1245, 1254 (Wyo. 2020) ("[It] is always improper for prosecutors to suggest they have personal knowledge of evidence not presented in court, and to suggest jurors should convict on the basis of such evidence."); *Doherty v. State*, 2006 WY 39, ¶ 20, 131 P.3d 963, 969-70 (Wyo. 2006) ("Although wide latitude is allowed in discussing inferences to be drawn from the evidence, prosecutors must limit their closing arguments to commenting on the evidence.") (citation omitted). In this case, the prosecutor told the jury he had interviewed TC and talked with Ms. King, but there was no evidence at trial that he or anyone else had ever

done so.  In fact, Officer Hipsag testified he had not interviewed these witnesses, and Mr. King argued the investigation was, therefore, flawed.  The prosecutor's statement was improper.  As we stated above, we will decide whether Mr. King was materially prejudiced by the prosecutor's misconduct (the third prong of plain error review) when discussing his cumulative error argument below.

### *Community Protection*

[¶48]  During cross examination, Officer Hipsag admitted that in his interview of MI, he told her, "We'll put it all together, and hopefully [Mr. King] never does this again[.]"  He also conceded that during his interview of JC, he stated:  "I [would] just as soon [Mr. King] spend the rest of his life in prison, and that's what I'm going to try to do for you guys[.]"  The district court warned defense counsel that Officer Hipsag's statement about wanting Mr. King to spend the rest of his life in prison was "not something that would ordinarily be a consideration for the jury."  Defense counsel maintained the statement was relevant to show Officer Hipsag's bias.

[¶49]  During closing argument, defense counsel criticized Officer Hipsag's investigation. He noted it was clear from Officer Hipsag's interview of MI that "law enforcement had already made up their mind about what happened" without having done any investigation or interviewing Mr. King.  He argued Officer Hipsag's comments to MI and JC that "hopefully [Mr. King] never does this again" and his hope that Mr. King spends the rest of his life in prison made it "abundantly clear" that Officer Hipsag and his investigation were biased against Mr. King.  During rebuttal closing, the prosecutor stated:

> Investigator Hipsag says the investigation may have been short, may not have, but it was thorough.  And all the interviews were recorded by audio and video.  "Hopefully he never does it again."  One would hope so.  He's entitled to say, "I hope he spends the rest of his life in prison."

[¶50]  Mr. King contends the prosecutor's comments in rebuttal constituted prosecutorial misconduct because it is improper for a prosecutor to encourage the jury to convict a defendant to protect the community rather than upon the evidence presented at trial.  We agree with this general statement of the law.  *See Burton v. State*, 2002 WY 71, ¶ 15, 46 P.3d 309, 314 (Wyo. 2002) ("[I]t is improper for a prosecutor to encourage the jury to convict a defendant in order to protect the community rather than upon the evidence presented at trial.") (citation omitted).  In this case, however, the prosecutor's comments did not encourage the jury to convict Mr. King to protect the community.  In context, the prosecutor was simply responding to Mr. King's argument that Officer Hipsag and his investigation were not impartial based on Officer Hipsag's comments to MI and JC during their interviews.  He reasonably argued the comments did not show bias but rather were reasonable reactions/statements to the victims' accusations.

17

### D. *Cumulative Error/Prejudice*

[¶51]   Mr. King argues the cumulative effect of the errors at trial deprived him of a fair trial.  "'The purpose of evaluating for cumulative error is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error.'"  *Hicks*, ¶ 40, 478 P.3d at 663 (quoting *Buszkiewic v. State*, 2018 WY 100, ¶ 43, 424 P.3d 1272, 1284 (Wyo. 2018)) (other citation omitted).   "When performing a cumulative error analysis, 'we consider only matters that were determined to be errors, and not any matter assigned as error but determined not to be erroneous.'"  *Id.* (quoting *Sweet*, ¶ 40, 234 P.3d at 1207) (other citation omitted).   We have identified one evidentiary error—the admission of evidence that Mr. King threatened JC—and two instances of prosecutorial misconduct—the prosecutor's comment in closing argument that he had never "seen such raw fear and terror" and the prosecutor's statement in rebuttal that he had interviewed TC and talked with Ms. King. We now consider whether these errors prejudiced Mr. King.  *See Jendresen v. State*, 2021 WY 82, ¶ 53, 491 P.3d 273, 288 (Wyo. 2021) ("'[A] series of . . . errors will only be cause for reversal where the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial.'" (quoting *Armajo*, ¶ 42, 478 P.3d at 195)).

[¶52]   "'Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made.   Prejudicial error requires reversal, while harmless error does not.'"  *Miller v. State*, 2021 WY 16, ¶ 20, 479 P.3d 387, 392-93 (Wyo. 2021) (quoting *Volpi v. State*, 2018 WY 66, ¶ 33, 419 P.3d 884, 894 (Wyo. 2018)).   "In determining whether [a defendant] was prejudiced, we review the entire record."  *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634-35 (Wyo. 2017).

[¶53]   When evaluating the prejudicial effect of evidentiary error, we consider:   "(1) whether the evidence furnished important corroboration of other testimony; (2) whether it related to a material, consequential fact; (3) whether counsel relied on the evidence in argument; (4) whether the evidence was cumulative; and (5) the effect of any instructions given to the jury."  *Id.* (quoting *Zabel v. State*, 765 P.2d 357, 362 (Wyo. 1988)) (other citation omitted).   We balance the following factors when considering whether prosecutorial misconduct prejudiced the defendant:   "1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct."  *Rodriguez v. State*, 2022 WY 109, ¶ 31, 516 P.3d 850, 856 (Wyo. 2022) (quoting *Klingbeil*, ¶ 44, 492 P.3d at 289, and *McGinn*, ¶ 16, 361 P.3d at 299-300).   Under either analysis, the strength of the State's case is the most important factor.  *Id.*, ¶ 36, 516 P.3d at 857; *Hathaway*, ¶ 33, 399 P.3d at 634.

18

[¶54] We conclude there is no reasonable possibility the verdict would have been more favorable to Mr. King had the evidence that he threatened JC not been admitted and had the prosecutor not committed misconduct. The evidence against Mr. King was strong. While MI and JC had difficulty pinpointing the dates of the abuse, they did not waver when describing the abuse. MI testified Mr. King exposed his penis to her while sitting on the fireplace at the Kings' home in the Sleepy Hollow subdivision with his sweatpants pulled down. She said he placed her hand on his "hard" penis while she was laying on the Kings' green couch in their Sleepy Hollow home and his breath smelled of cinnamon and cigarettes. TC, Ms. King, and/or Mr. King (through his interview with Officer Hipsag and Sergeant Hyland) confirmed that from 1999-2001, the Kings lived in a house in the Sleepy Hollow subdivision and the house had a fireplace and a green couch. Ms. King told the jury that Mr. King wore t-shirts and sweatpants around the house, liked his coffee with "[c]ream, sugar, [and] cinnamon," was a smoker, and "regularly smell[ed] of cinnamon coffee and cigarettes." Mr. King admitted to Officer Hipsag and Sergeant Hyland that he sometimes put cinnamon in his coffee.

[¶55] JC testified Mr. King digitally penetrated her vagina in Summer 2007 while she was babysitting the Kings' grandchildren in their townhome on Oregon Avenue in the Westover subdivision. TC, Ms. King, and/or Mr. King (again through his interview with Officer Hipsag and Sergeant Hyland) confirmed the Kings lived in a townhome on Oregon Avenue during Summer 2007, the Kings' grandchildren stayed with the Kings that summer, and JC babysat the Kings' grandchildren while they were visiting.

[¶56] Officer Hipsag and Sergeant Hyland testified they interviewed Mr. King. They told the jury that each time they confronted Mr. King with the accusations against him, he leaned in and said, "I'm sorry, I didn't [or can't] hear you." He never had any difficulty hearing the officers except when asked about the abuse. Officer Hipsag and Sergeant Hyland testified that in their training and experience, this behavior was "odd."

[¶57] The prosecutor relied on the threat evidence in closing argument. However, the threat evidence was not similar to the crimes Mr. King was charged with, thereby decreasing the likelihood that the jury "drew the improper inference that if [Mr. King] did something similar before, he probably did it again" or used the evidence "to place [him] in a different and unfavorable light." *Kincaid v. State*, 2022 WY 4, ¶ 55, 501 P.3d 1257, 1268 (Wyo. 2022) (citation omitted); *Moser v. State*, 2018 WY 12, ¶ 22, 409 P.3d 1236, 1244 (Wyo. 2018). Moreover, it is clear from the record the prosecutor did not use the threat evidence to show Mr. King was an unsavory person or to ask the jury to punish Mr. King for threatening JC. Rather, he offered it as an explanation for why JC had difficulty testifying at trial (i.e., she was scared of Mr. King) and remembering when the abuse occurred. While JC's credibility was a central issue at trial and the threat evidence was an important piece of the State's attempt to bolster her credibility, it was not the only piece. The jury also heard evidence that the reason JC was scared of Mr. King was because he

19

abused her, and the reason she could not pinpoint the dates of the abuse was due to the significant time lapse between the abuse and trial.

[¶58]   The prosecutor's comment during closing argument about his observation of MI and JC's "raw fear and terror" offered a personal opinion on the veracity of MI and JC, a central issue at trial.   However, the comment was not severe or pervasive as it consisted of one line during a three-day trial.   The district court instructed the jury it was the exclusive judge of the credibility of the witnesses and that statements by counsel were not evidence.   We assume the jury followed these instructions and made its own independent determination of the credibility of the witnesses.  *Watts v. State*, 2016 WY 40, ¶ 25, 370 P.3d 104, 113 (Wyo. 2016).

[¶59]   The prosecutor's statement during rebuttal referred to evidence not presented to the jury during trial.   However, the prosecutor did not ask the jury to convict Mr. King based on this evidence and, in fact, did not disclose what TC or Ms. King said during their communications with him.   The statement was also not severe or pervasive as it too was a brief comment during a three-day trial.   Again, the jury was instructed that the attorneys' statements were not evidence.   It was also instructed that it "must determine the facts from the evidence produced . . . in court."

[¶60]   Mr. King was not prejudiced by the evidentiary error or the prosecutor's misconduct, whether considered individually or collectively.

## CONCLUSION

[¶61]   The State presented sufficient evidence at trial to show Mr. King committed third-degree sexual assault "on or between December 2000 and February 2001."   The district court did not abuse its discretion and/or Mr. King waived any argument or was not prejudiced by any evidentiary error at trial.   Mr. King was not prejudiced by the prosecutorial misconduct at trial.

[¶62]   Affirmed.