# IN THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 85

APRIL TERM, A.D. 2023

August 24, 2023

JETT GARRIOTT ADAMS,

Appellant
(Defendant),

v.

S-22-0285

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Carbon County*
*The Honorable Dawnessa A. Snyder, Judge*

*Representing Appellant:*
> Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*
> Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General. Argument by Ms. Jones.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    Following a bench trial, the district court convicted Jett Garriott Adams of attempted murder, aggravated assault and battery, and other charges stemming from a high-speed car chase and shootout with law enforcement.  On appeal, Mr. Adams asserts the State committed prosecutorial misconduct when it presented certain testimony from the psychologists who conducted his competency and mental health evaluations pursuant to Wyo. Stat. Ann. §§ 7-11-303 and 7-11-304 (LexisNexis 2023).  Finding no misconduct, we affirm.

## *ISSUE*

[¶2]    We restate the single issue presented as:

> Did the State commit prosecutorial misconduct by introducing statements and information obtained during Mr. Adams's competency evaluation and subsequent mental illness or deficiency evaluation?

## *FACTS*

[¶3]    The events leading to Mr. Adams's arrest and conviction began in Kansas City, Missouri.  Mr. Adams was serving a period of probation after a felony conviction.  He received notice of an alleged probation violation but decided not to attend his probation revocation hearing.  Instead, he purchased a firearm and made plans to buy more weapons.  He testified he intended to shoot law enforcement, the prosecutor, and the judge in Missouri to avoid going to prison, but a friend talked him out of that plan and suggested he leave Missouri instead.  The day before his probation revocation hearing, Mr. Adams cut off his GPS monitor and began driving to Idaho to start a new life, get a job, and "lay low" in the hopes that law enforcement would not find him.

[¶4]    While driving west across Wyoming on Interstate 80, Mr. Adams exceeded the posted speed limit in a variable speed zone on icy roads.  Highway Patrol Trooper Hobbs observed the speeding violation and initiated a traffic stop.  Trooper Hobbs asked Mr. Adams for his license, registration, and insurance.  Mr. Adams could not produce his registration or insurance.  Trooper Hobbs asked Mr. Adams to come with him to his patrol vehicle.  Mr. Adams feared that Trooper Hobbs had seen his firearm or ammunition in the car and that Trooper Hobbs would soon know he was a felon in possession of a firearm, arrest him, and take him to jail.  Instead of going to the patrol car as directed, Mr. Adams sped away.

[¶5]    A short high-speed chase followed.  Mr. Adams soon pulled over again.  Trooper Hobbs treated this stop as a felony stop, thus drawing his sidearm when he opened the door

1

of his vehicle. Mr. Adams exited his vehicle, holding his own firearm. A shootout ensued. Trooper Hobbs remained at his vehicle, at times either crouching or standing behind the open driver's side door for cover and concealment. The shootout was short in duration but long enough for both participants to empty their magazines: Trooper Hobbs fired sixteen rounds and Mr. Adams fired seven rounds. Multiple bullets hit Trooper Hobbs's vehicle close to the driver's side door. Some shrapnel cut his forehead, but neither person was shot. Mr. Adams re-entered his vehicle and sped away.

[¶6] A second high-speed chase began, with a Carbon County Sheriff's Deputy and another Highway Patrol vehicle joining Trooper Hobbs in pursuit of Mr. Adams. The vehicles exceeded 100 miles per hour, often swerving or using the emergency lane to avoid other vehicles and semi-truck traffic. During this chase, Mr. Adams continued shooting at Trooper Hobbs through the back windshield of Mr. Adams's vehicle. Mr. Adams discharged his weapon at least 28 times.

[¶7] Mr. Adams eventually drove off the interstate highway, through a fence, and across the roadless desert, untracked snow, and sagebrush. The Troopers and Deputy followed in the Deputy's four-wheel drive vehicle. Mr. Adams's car soon stopped, unable to proceed in the terrain and snow. He continued fleeing on foot but left his gun in the car. He promptly surrendered when law enforcement caught up to him.

[¶8] The State charged Mr. Adams with ten counts: attempted murder (against Trooper Hobbs), two counts of aggravated assault and battery, felony interference with a peace officer, felony property destruction, aggravated fleeing or eluding a police officer, use of a firearm while committing a felony, reckless driving, reckless endangerment, and speeding.

[¶9] Mr. Adams initially pleaded not guilty to all charges, and defense counsel asked for a competency evaluation pursuant to Wyo. Stat. Ann. § 7-11-303. The court suspended proceedings while Dr. Paul Murdock conducted the competency evaluation. Dr. Murdock found Mr. Adams was competent to proceed.

[¶10] Mr. Adams then entered a new plea of not guilty by reason of mental illness or deficiency (NGMI), requiring an evaluation pursuant to Wyo. Stat. § 7-11-304. Dr. Renee Wilkinson conducted the NGMI evaluation. Dr. Wilkinson diagnosed Mr. Adams with depression, anxiety, and borderline personality disorder but concluded Mr. Adams did not lack the mental capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law at the time of the alleged events. Defense counsel then asked the Public Defender's office to pay for a second NGMI evaluation. That request was denied. Mr. Adams also wrote a pro se letter to the court asking for assistance to obtain a second evaluation. No second evaluation occurred.

[¶11] Mr. Adams then requested a bench trial, and the State ultimately agreed to try this case without a jury. The State presented the testimony of Dr. Wilkinson. Trooper Hobbs

and the two other law enforcement officers involved in the second high-speed chase also testified, as did other witnesses related to the arrest, the investigation, and the alleged property damage. The State also played Mr. Adams's post-arrest interview with the Wyoming Division of Criminal Investigation and law enforcement's dash cam video to the court. Following the close of the State's evidence, Mr. Adams testified for several hours in his own defense. He also presented the testimony of Ms. Rice, a mental health examiner at the local jail. The State then called one rebuttal witness, Dr. Murdock. Defense counsel cross-examined Dr. Murdock and the State followed with limited redirect examination.

[¶12] The court took the matter under advisement at the conclusion of the three-day trial. In its written verdict and decision letter issued a few weeks later, the court found Mr. Adams guilty on nine counts. It sentenced Mr. Adams to life in prison without the possibility of parole on the charges of attempted murder and aggravated assault and battery, with consecutive sentences of various lengths on the other counts. This appeal timely followed to challenge, as noted above, whether the prosecutor improperly introduced certain information from the two mental health examiners.

## STANDARD OF REVIEW

[¶13] Mr. Adams did not contemporaneously object to the prosecutor's questioning of either examiner, so we review the alleged misconduct for plain error. *King v. State*, 2023 WY 36, ¶ 33, 527 P.3d 1229, 1242 (Wyo. 2023). Mr. Adams has the burden to show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice. *Id.* (quoting *Ridinger v. State*, 2021 WY 4, ¶ 33, 478 P.3d 1160, 1168 (Wyo. 2021)); *Lott v. State*, 2022 WY 143, ¶ 10, 519 P.3d 646, 649 (Wyo. 2022).

## DISCUSSION

[¶14] The record is clear the State called Dr. Wilkinson and Dr. Murdock to testify at trial, and their testimony included statements and information they obtained during their respective examinations of Mr. Adams. Thus, we proceed to consider whether the State elicited that testimony in violation of a clear and unequivocal rule of law and whether Mr. Adams was denied a substantial right resulting in material prejudice. *King*, 2023 WY 36, ¶ 33, 527 P.3d at 1242 (citation omitted).

[¶15] We have characterized prosecutorial misconduct as:

> [A] prosecutor's improper or illegal act (or failure to act), especially involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment. Prosecutorial misconduct claims are not intended to provide an avenue for tactical sandbagging of the trial courts, but rather,

3

to address gross prosecutorial improprieties that have deprived a criminal defendant of his or her right to a fair trial. A prosecutor's conduct is not misconduct unless he knew or should have known it would deprive the defendant of the right to a fair trial. It is something more than evidentiary error. We distinguish prosecutorial misconduct from evidentiary error because otherwise, any evidentiary error which favors the State would be considered prosecutorial misconduct.

*Id.* ¶ 16, 527 P.3d at 1238 (citations and internal quotations omitted).

[¶16] The distinction between evidentiary error and prosecutorial misconduct is an important one—the gravamen of Mr. Adams's appeal is that certain testimony by two mental health evaluators was inadmissible evidence pursuant to statutory limitations in Wyo. Stat. Ann. §§ 7-11-303 and 7-11-304. Misconduct occurs when a prosecutor knowingly uses inadmissible evidence or asks legally objectionable questions. *Bogard v. State*, 2019 WY 96, ¶ 51, 449 P.3d 315, 327 (Wyo. 2019) (discussing ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993)); *Wilde v. State*, 2003 WY 93, ¶ 27, 74 P.3d 699, 711 (Wyo. 2003) (citations omitted).

> (d) The prosecutor should not bring to the attention of the trier of fact matters that the prosecutor knows to be inadmissible, whether by offering or displaying inadmissible evidence, asking legally objectionable questions, or making impermissible comments or arguments. If the prosecutor is uncertain about the admissibility of evidence, the prosecutor should seek and obtain resolution from the court before the hearing or trial if possible, and reasonably in advance of the time for proffering the evidence before a jury.

ABA Standards for Criminal Justice: Prosecution Function and Defense Function (4th ed. 2017) at § 3-6.6(d). Prosecutorial misconduct—as opposed to evidentiary error by the trial court—requires the prosecutor's conduct offering inadmissible evidence be improper, such that it was an attempt to wrongfully convict Mr. Adams. *King*, ¶ 16, 527 P.3d at 1238 (citations and internal quotations omitted). While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314 (1935).

[¶17] The two elements of plain error we evaluate in this case—clear and unequivocal rule of law and material prejudice—are central to us determining whether the prosecutor's questioning of Drs. Wilkinson and Murdock was improper or calculated to produce a

4

wrongful conviction. We have not evaluated the scope of the admissibility limitations in Wyo. Stat. Ann. §§ 7-11-303 and 7-11-304. That lack of Wyoming precedent calls into question whether we can find a violation of a "clear and unequivocal" rule of law at the time of trial. *See Schmuck v. State*, 2017 WY 140, ¶¶ 34–35, 406 P.3d 286, 298 (Wyo. 2017). We have consistently declined to state when a rule of law must be "clear and unequivocal"—at the time of trial when the alleged error or misconduct occurred, or at the time of appellate review. *Id.* (discussing *Johnson v. State*, 2015 WY 118, ¶ 21, 356 P.3d 767, 773 (Wyo. 2015) and *Miller v. State*, 2015 WY 68, ¶ 7–8, 350 P.3d 264, 266 (Wyo. 2015)). We again decline to answer that question because the prosecutor did not violate the limits of Wyo. Stat. Ann. §§ 7-11-303 or 7-11-304 and because Mr. Adams cannot meet the third prong of plain error review, prejudice. *See id.* ¶ 35, 406 P.3d at 298 ("[I]t remains unnecessary to decide when a rule of law must be 'clear and unequivocal' under the second prong of plain error review. [Appellant] suffered no prejudice from the instruction given and cannot satisfy the third prong.").

[¶18] The testimony the prosecutor elicited from Dr. Wilkinson did not introduce the type of self-incriminating statements or evidence of guilt the statutory limitations are designed to protect against. The statement about Mr. Adams's intent when he shot at Trooper Hobbs elicited from Dr. Murdock as a rebuttal witness was an unsolicited statement which the prosecutor did not point to during trial. Moreover, that statement was limited to the issue of Mr. Adams's mental condition at the time of the events—a door defense counsel opened during its cross-examination of Dr. Murdock on rebuttal. Equally important, we conclude that neither doctor's testimony materially prejudiced Mr. Adams. The record discloses no gross prosecutorial impropriety that deprived Mr. Adams of his right to a fair trial or attempt to persuade the trial court to wrongly convict him.

## I. *Dr. Wilkinson's Testimony Did Not Violate a Clear and Unequivocal Rule of Law.*

[¶19] Dr. Wilkinson, by court order, conducted the NGMI evaluation for Mr. Adams. When a defendant enters a plea of not guilty by reason of mental illness or deficiency, he has the burden to prove, by a preponderance of the evidence, that as a result of that mental illness or deficiency he lacked "mental responsibility" for his criminal conduct, meaning he lacked the mental capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Wyo. Stat. Ann. § 7-11-305(b); *Gabbert v. State*, 2018 WY 69, ¶ 15, 420 P.3d 172, 176 (Wyo. 2018) (adopting preponderance of the evidence as the standard of proof for NGMI defenses). Only designated examiners are competent to testify about the defendant's mental responsibility. Wyo. Stat. Ann. § 7-11-305(c). Those examiners can testify about the nature of their examination and diagnosis and provide opinion testimony. *Id.* § 7-11-305(e). They may also be cross-examined about their competence as an examiner and the credibility of their diagnosis and opinion. *Id.*

5

[¶20]   However, Wyo. Stat. Ann. § 7-11-304(h) limits how information the examiner may receive during an NGMI evaluation can be used in evidence:

> (h) Except as otherwise provided in this subsection, no statement made by the defendant in the course of any examination or treatment pursuant to this section and **no information received by any person in the course thereof is admissible in evidence in any criminal proceeding on any issue other than that of the mental condition of the defendant.** If the defendant testifies in his own behalf, any statement made by him in the course of any examination or treatment pursuant to this section may be admitted:
>
> > (i) For impeachment purposes; or
> >
> > (ii) As evidence in a criminal prosecution for perjury.

(emphasis added).

[¶21]   To evaluate the limits of Wyo. Stat. Ann. § 7-11-304(h), and later in this opinion to evaluate § 7-11-303(h), we can look to federal precedent interpreting similar rules as persuasive authority. *Pena v. State*, 2013 WY 4, ¶ 48, 294 P.3d 13, 22–23 (Wyo. 2013). The federal counterpart is found in Federal Rule of Criminal Procedure 12.2(c)(4):

> No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:
>
> > (A) has introduced evidence of incompetency or evidence requiring notice under Rule 12.2(a) or (b)(1), or
> >
> > (B) has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

F.R.Cr.P. 12.2(c)(4).  This rule is rooted in the Fifth Amendment's protection against self-incrimination. *E.g.*, *United States v. Troya*, 733 F.3d 1125, 1138 (11th Cir. 2013); *United*

6

*States v. Henderson*, 770 F.2d 724, 729 (8th Cir. 1985); 14A Wright & Miller, Fed. Prac. & Proc. Crim. § 206 (5th ed) (April 2023 update).

[¶22]   Federal courts recognize the tension with the right against self-incrimination when examining psychiatrists are asked to testify about information they gathered from conversations with the defendant.  See *Troya*, 733 F.3d at 1138; *Henderson*, 770 F.2d at 729.  "For this reason Congress could have elected to completely forbid the examining psychiatrist from testifying on the merits at trial." *Henderson*, 770 F.2d at 729.  Instead, however, Congress "chose only to limit the testimony," *id.*; H.R.Conf.Rep. No. 94-414, 94th Cong., 1st Sess.1975, p. 10, reprinted in 1975 U.S. Code Cong. & Adm. News 1358, 1399 ("The rule does not preclude use of statements made by a defendant during a court-ordered psychiatric examination.   The statements may be relevant to the issue of defendant's sanity and admissible on that issue."), recognizing that "issues of mental capacity and guilt will necessarily overlap." *Henderson*, 770 F.2d at 729 (citing *United States v. Halbert*, 712 F.2d 388, 390 (9th Cir. 1983)).   "While the government should exercise caution when presenting psychiatric testimony it should not be bound by a strict interpretation of the limitation." *Id.*

[¶23]   Accordingly, a defendant's statements offered as a basis for an expert's opinion on the issue of his mental condition—whether sanity, competency, or other mental illness or deficiency—are admissible and fall within the limitations prescribed by Rule 12.2(c). *United States v. Madrid*, 673 F.2d 1114, 1120–21 (10th Cir. 1982) ("Thus, the statements made by the defendant during the Rule 12.2(c) examination were admissible at trial as a basis for the expert's opinion on the issue of sanity."); *United States v. Hinckley*, 525 F. Supp. 1342, 1348–49 (D.D.C. 1981) ("The verbal content of any communication between the defendant and mental health experts may well be an essential basis for a meaningful psychiatric examination.   While this suggests that the psychiatric conclusions . . . are composed largely of testimonial evidence, the Court cannot agree that use of this evidence to controvert defendant's insanity defense would be incriminating within the terms of the privilege."). *See also United States v. Miller*, 267 F. Supp. 2d 104, 107–08 (D. Me. 2003) (recognizing that Rule 12.2(c)(4) applies to "any statements made in any psychiatric or psychological examinations, be they examinations to determine competency, insanity, or some other mental defect.").   "[W]hen the defendant has raised the issue of insanity and the psychiatrist is called to testify on this question, the defendant must not be allowed to muzzle him at his option." *Madrid*, 673 F.2d at 1121 (quoting *United States v. Julian*, 469 F.2d 371, 376 (10th Cir. 1972)); *United States v. Curtis*, 328 F.3d 141, 145 (4th Cir. 2003) ("Fed.R.Crim.P. 12.2(c) clearly provides that the government may introduce expert testimony *if* the defendant has raised the issue of his mental condition."); *see also Commonwealth v. Morley*, 658 A.2d 1357, 1360–61 (Penn. 1995) (reviewing this area of federal law as persuasive authority in a state prosecution).

[¶24]   Mr. Adams asserts the following testimony from Dr. Wilkinson during the State's case-in-chief violated the limits prescribed by Wyo. Stat. Ann. § 7-11-304(h):

7

Q. [Doctor] Wilkinson, did you get background information from Mr. Adams?

A. Yes, I did ask him about this background.

Q. And what information did he provide?

A. Yeah. Initially when I do an interview, I talk about, you know kind of family and childhood. And he mentioned a pretty significant history of abuse and being in foster care. And he seemed pretty resentful about his childhood and the abuse and neglect that he recalls.

Let's see. He -- we talked about his education, and he mentioned that he had moved schools a lot and, you know, probably didn't do that well, but he ended up getting his GED. And he had some various jobs along the way, maybe a couple of months or five months at the most, maybe.

A bit of homelessness, and he -- although he had been able to support himself for a while, he hasn't received disability for any type of mental disorder in the past.

He wasn't married. He denied a history of alcohol and drug use. And he told me about some of the counseling that he did when he was on probation in 2019.

[¶25] To evaluate Mr. Adams's claim, we review the challenged testimony in relation to the rest of the trial testimony and ask whether the prosecutor asked about, or Dr. Wilkinson spoke to, any issue(s) other than Mr. Adams's mental condition or the nature of her examination and diagnosis. We conclude the questions and responses were appropriately limited to the confines of Wyo. Stat. Ann. § 7-11-304(h). As a threshold matter, we note that Dr. Wilkinson did not relay any self-incriminating statements. She relayed information about Mr. Adams's childhood and background. Even considering that information as fruits of Mr. Adams's statements, none of the information was self-incriminating.

[¶26] Second, it is clear from the trial transcript that the State offered this testimony to establish the foundation for Dr. Wilkinson's opinion, namely to illustrate how Dr. Wilkinson typically gathers information for her evaluation and how that information fits in to her diagnosis. The prosecutor first asked Dr. Wilkinson to describe the purpose of an NGMI evaluation. She responded that she looks at whether the person has a mental illness or disorder; if that illness or disorder was present at the time of the events; and if it was

8

present, whether as a result of that illness or disorder, the person lacked the mental capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Dr. Wilkinson was then asked to describe what information she looks at as part of her evaluation. That information includes, among other things, information about the defendant's pre-event mental health status, related records, and life history; information about the alleged events; and information about the defendant after the alleged events.

[¶27] After describing the scope of information she would review for any evaluation, Dr. Wilkinson affirmed she obtained that same information for her evaluation of Mr. Adams. She reviewed information about his arrest and jail records including mental health notes by jail staff. She reviewed recordings of Mr. Adams's telephone calls made from jail, police reports, and the interview recorded the day of the arrest. She also interviewed Mr. Adams. During that interview, she asked Mr. Adams about his background, which led to the testimony that Mr. Adams now asserts was improper. After gathering the body of information she described, Dr. Wilkinson concluded that Mr. Adams suffers from depression, anxiety, and borderline personality disorder. She went on to conclude those conditions did not leave him unable to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law.

[¶28] Because Mr. Adams's mental health history, childhood and other background information formed part of the foundation for Dr. Wilkinson's diagnosis that Mr. Adams suffers from depression, anxiety, and borderline personality disorder, it was admissible under Wyo. Stat. Ann. § 7-11-304(h). To conclude otherwise and prohibit this information, we risk eliminating the ability of counsel to establish the foundation and bases for mental health examiners' opinions, which only the examiners are permitted to provide, and we limit the ability of opposing counsel to cross-examine the examiners about their opinions, which counsel has a statutory right to do. Wyo. Stat. Ann. § 7-11-305(c), (e). While, as in federal court, the government should exercise some caution in this area, *Henderson*, 770 F.2d at 729, we are unable to find in the facts of this case that the prosecutor's questions of Dr. Wilkinson violated a clear or unequivocal rule of law.

[¶29] Our conclusion is bolstered by the limited use of this background information by the State and the trial court. The State did not offer, and the court did not admit, Dr. Wilkinson's testimony on any issue other than that of Mr. Adams's mental condition. As noted above, it was offered to describe the information used to make a diagnosis about Mr. Adams's depression, anxiety, and borderline personality disorder. In closing arguments, the prosecutor only briefly mentioned that Dr. Wilkinson took into account Mr. Adams's background when she determined he was criminally responsible at the time of the events, meaning he did not lack the mental capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

[¶30] The trial court's decision letter likewise reflects the limited proffer of Mr. Adams's background information by Dr. Wilkinson to inform the mental health diagnosis of anxiety,

9

depression, and borderline personality disorder—"She makes this diagnosis due to the report of abandonment, emptiness, self-harm, suicidal feelings, and relationship issues reported to her." The trial court did note additional, and more detailed, background history about Mr. Adams's childhood but only when summarizing his own, more lengthy trial testimony about his childhood and periods of abuse. We further address Mr. Adams's own testimony, and his counsel's use of that testimony, in relation to prejudice.

## II. *Dr. Wilkinson's Testimony Did Not Materially Prejudice Mr. Adams.*

[¶31] Material prejudice is the third prong of our plain error analysis. *King*, 2023 WY 36, ¶ 33, 527 P.3d at 1242. Under the plain error standard, Mr. Adams must show that the alleged error denied him a substantial right resulting in material prejudice. *Id.* The accused's right to a fair trial is a substantial right. *Black v. State*, 2017 WY 135, ¶ 13, 405 P.3d 1045, 1050 (Wyo. 2017) (quoting *McGinn v. State* 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015)). We evaluate the entire record to determine if "a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable" to Mr. Adams. *McGinn*, ¶ 13, 361 P.3d at 299; *Gutierrez v. State*, 2020 WY 150, ¶ 5, 477 P.3d 528, 531 (Wyo. 2020). Mr. Adams's own trial testimony and his counsel's cross-examination of Dr. Wilkinson elicited more information about Mr. Adams's childhood traumas and his background than that which he complains of on appeal. Therefore, excluding the foundation information the prosecutor elicited from Dr. Wilkinson about Mr. Adams's childhood history and past abuse would not have changed the outcome of trial.

[¶32] Defense counsel began her cross-examination of Dr. Wilkinson by asking about certain mental health records that reflected a long history of mental health evaluations for Mr. Adams. Those mental health records were obtained by the defense and disclosed to the State a few weeks prior to trial in preparation of presenting Mr. Adams's NGMI defense. The records were provided to Dr. Wilkinson about a week before trial. She agreed with defense counsel that the new records strengthened her diagnosis of borderline personality disorder. Defense counsel then asked Dr. Wilkinson about the role of childhood trauma and abuse, including that reported to her by Mr. Adams, in borderline personality disorder and other mental health diagnoses.

[¶33] When Mr. Adams testified at trial, he also testified at some length about his childhood and history of abuse. Relying in part on Dr. Wilkinson's testimony and in part of Mr. Adams's testimony, defense counsel then argued at closing that Mr. Adams's fight or flight response on the day of his arrest was linked to his mental and emotional health, which was informed by a lifetime of sustained trauma, various types of abuse, lack of nurturing, and a history of institutional living.

[¶34] Looking at the contested portions of Dr. Wilkinson's testimony within the larger record, we conclude that had the court excluded the State's questioning of Dr. Wilkinson on direct examination about the foundations for her diagnoses, the court's decision would

not have been different. If prejudice occurred at trial related to Mr. Adams's background, it was through his own testimony and the use his counsel made of it while advocating the NGMI defense.

### III. Dr. Murdock's Testimony as a Rebuttal Witness and on Re-Direct Examination Did Not Violate a Clear and Unequivocal Rule of Law.

[¶35] Dr. Murdock, by court order, conducted Mr. Adams's competency evaluation early in this case, prior to the entry of Mr. Adams's NGMI plea. Dr. Murdock testified as a rebuttal witness after the defense presented its testimony and evidence for Mr. Adams's NGMI defense.

[¶36] Wyo. Stat. Ann. § 7-11-303(h) limits how information the examiner receives during a competency evaluation can be used in evidence:

> (h) A finding by the court that the accused is mentally fit to proceed shall not prejudice the accused in a defense to the crime charged on the ground that at the time of the act he was afflicted with a mental illness or deficiency excluding responsibility. Nor shall the finding be introduced in evidence on that issue or otherwise brought to the notice of the jury. **No statement made by the accused in the course of any examination or treatment pursuant to this section and no information received by any person in the course of the examination or treatment shall be admitted in evidence in any criminal proceeding then or thereafter pending on any issue other than that of the mental condition of the accused**.

(emphasis added). As with our analysis of Wyo. Stat. Ann § 7-11-304(h), we have not evaluated the limits of this subsection before. Again, we can look to federal authority interpreting similar rules as persuasive authority. *Pena*, 2013 WY 4, ¶ 48, 294 P.3d at 22–23. The federal counterpart remains Federal Rule of Criminal Procedure 12.2(c)(4), which applies to competency as well as pleas of insanity. *Madrid*, 673 F.2d at 1121 (discussing the application of this body of law in competency proceedings (citations omitted)); *Miller*, 267 F. Supp. 2d at 106–08 (discussing the history of Rule 12.2(c) and its application to "any psychiatric or psychological examinations, be they examinations to determine competency, insanity, or some other mental defect").

[¶37] Mr. Adams asserts the following testimony, elicited by the prosecutor during redirect examination of Dr. Murdock, violated the limits set forth in Wyo. Stat. Ann. § 7-11-303(h):

> Q. [Doctor] Murdock, when you first met with Mr. Adams, did he discuss with you the facts of his case?

11

A. Yes. He provided -- I asked him for a brief narrative of the offense of what happened.

Q. And so he told you he had shot at a law enforcement officer?

A. Yeah. He said he was on his way to, I believe, Idaho Falls or Idaho, and that he was pulled over. They asked him for his driver's license and registration, I believe. He told me that he didn't have insurance, that he had let that drop. The officer asked him to get out of the car and speak with him.

And then Mr. Adams told me that he was wanted back in Missouri, that he had a pistol in the door. He said he freaked out. He said -- I think he said, quote, I had a console full of ammo. And he thought it was all over, and so he took off.

Q. Did he ever tell you that he was, I guess, confused or in the middle of a flashback?

A. No.

Q. Did he ever tell you he was shooting at a parent or a care provider?

A. No.

Q. Did he ever tell you he misunderstood what was happening?

A. No. In fact, **he told me that, "If I shoot him, I can end this and get away."**

(emphasis added). This line of questioning continued with one more question and answer:

Q: And never during the discussions with him did he disclose anything about having episodes of disassociation?

A: No, nor did I observe that rationale or explanation anywhere in the police report.

[¶38] At first glance, this testimony, which relayed a statement by Mr. Adams about his intent, might appear to violate the limits of Wyo. Stat. Ann. § 7-11-303(h). It is, after all, a statement, and it implicates the Fifth Amendment protection against self-incrimination. However, we find no prosecutorial misconduct for three reasons.

12

[¶39]  First, we must again confront the distinction between evidentiary error, by the trial court, and prosecutorial misconduct.  To analyze Mr. Adams's prosecutorial misconduct claim, we examine whether the prosecutor's conduct was improper such that it was an attempt to wrongfully convict Mr. Adams.  *King*, ¶ 16, 527 P.3d at 1238 (citations and internal quotations omitted).  Here, consistent with prior yes–no questions, each of which produced a short answer "no," the prosecutor asked Dr. Murdock a yes–no question—"Did he ever tell you he misunderstood what was happening?"  Dr. Murdock answered "no" and then, without prompting, offered additional testimony by sharing Mr. Adams's incriminating statement.  The trial transcript gives no indication the prosecutor knowingly elicited the additional statement or any other self-incriminating statement by Mr. Adams through Dr. Murdock's testimony.

[¶40]  Our review of closing arguments bolsters our finding that the prosecutor did not rely upon or draw attention to Mr. Adams's statement, "[i]f I shoot him, I can end this and get away," relayed through Dr. Murdock.  Summation of Dr. Murdock's testimony was more cursory than the summation of Dr. Wilkinson's testimony; it related only to Dr. Murdock's diagnosis of antisocial disorder and his description of PTSD characteristics, with no summation of the facts from Mr. Adams's interview that Dr. Murdock relied upon.  While, as noted earlier, the government should exercise some caution when questioning mental health examiners, *Henderson*, 770 F.2d at 729, we are unable to find this yes–no question by the prosecutor was an attempt to elicit inadmissible testimony or an attempt to convict Mr. Adams on inadmissible evidence.

[¶41]  Second, we conclude Dr. Murdock's testimony was offered on the issue of Mr. Adams's mental condition as raised by defense counsel during cross-examination.  After the State finished its case in chief, Mr. Adams testified at trial.  Mr. Adams testified in some detail about his thought processes when he decided to shoot at Trooper Hobbs.  He thought about shooting Trooper Hobbs so he could evade arrest and not be "put in a cage."  After the first car chase, he decided to shoot Trooper Hobbs to "stop him somehow, just stop him, stop coming after me."  During the second car chase, Mr. Adams continued shooting in an effort to either stop Trooper Hobbs or stop his vehicle:

> And I start shooting because it is a big object; it is a car. You hit him, you stop him. You hit the car, and you stop him. It is a whole lot easier to hit the Charger than it is to hit him, obviously.
>
> I don't particularly care. Well, if I kill him, well, guess what? I kill him. But if I don't kill him and I put a bullet through his hood, well, I stopped him.

[¶42]  After Mr. Adams's testified, Ms. Rice, a mental health examiner at the local jail, testified about her evaluation of Mr. Adams, her conversations with him over the course of

13

his incarceration, and his frustrations with Dr. Wilkinson's evaluation. She also testified about her review of Dr. Murdock's competency evaluation, the diagnoses within that document, and her understanding that Mr. Adams preferred Dr. Murdock's evaluation over Dr. Wilkinson's evaluation. The defense closed its case, and the State called one rebuttal witness, Dr. Murdock.

[¶43]  On direct rebuttal examination, the prosecutor asked Dr. Murdock to describe the scope of information he reviews when asked to make a competency evaluation. He identified the information he reviews and explained that he also interviews the individual being examined at least once. Dr. Murdock confirmed that he interviewed Mr. Adams and described how the information from that interview fit within his diagnosis and conclusion. Dr. Murdock went on to explain that Mr. Adams reported no history of flashbacks, post-traumatic stress disorder (PTSD), mania, delusions, hallucinations, or dissociative episodes. The prosecutor's questions in direct examination, and Dr. Murdock's answers, appear consistent with the format used for Dr. Wilkinson's testimony, limited to the mental condition of Mr. Adams related to the competency evaluation.

[¶44]  Then, the defense's cross-examination solicited additional information from Dr. Murdock about PTSD, and particularly about flashbacks and dissociative disorders as a result of PTSD. This comprised approximately half of the cross-examination. Next, the prosecutor's redirect examination responded to defense counsel's questions about PTSD, flashbacks, and disassociation. The prosecutor asked a series of questions to determine if Dr. Murdock opined that Mr. Adams was "confused," "in the middle of a flashback," thought he was "shooting at a parent or care provider," or "misunderstood what was happening." In response to the question about whether Mr. Adams misunderstood what was happening, Dr. Murdock answered no and then shared that Mr. Adams said, "If I shoot him, I can end this and get away." Dr. Murdock shared that statement in the context of discussing Mr. Adams's mental condition—PTSD, flashbacks, and dissociative disorders—in direct follow up to defense counsel's cross-examination questions about those mental conditions. This testimony was within the limits of Wyo. Stat. Ann. § 7-11-303(h). *See, e.g.*, *United States v. Coonce*, 932 F.3d 632, 636 (8th Cir. 2019) ("When a defendant introduces psychiatric evidence for a mental-status defense, though, the prosecution may then present its own psychiatric evidence in rebuttal. . . . [Rule 12.2(c)(4)] prohibit[s] the government from using any statement made by the defendant in the course of the government's examination, or any opinion based on such a statement, unless the defendant has introduced evidence on that particular issue."); 14A Wright & Miller, Fed. Prac. & Proc. Crim. § 206 ("The government is still permitted to use the defendant's statements made during a mental exam against him where the defendant has introduced 'evidence' of incompetency, insanity, or a mental condition that has a bearing on guilt.")

[¶45]  We also note that Mr. Adams relayed the same self-incriminating statements about his intent in his own testimony, which moderates the Fifth Amendment protections inherent in Wyo. Stat. § 7-11-303(h). *See Powell v. Texas*, 492 U.S. 680, 684, 109 S. Ct. 3146, 106

14

L. Ed. 2d 551 ("[I]f a defendant requests a psychiatric examination in order to prove a mental-status defense, he waives the right to raise a Fifth Amendment challenge to the prosecution's use of evidence obtained through that examination to rebut the defense." (discussing *Buchanan v. Kentucky*, 483 U.S. 402, 422–23, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987))); *Brown v. United States*, 356 U.S. 148, 154–56, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958) (discussing waiver of the privilege against self-incrimination when a defendant elects to testify); *Troya*, 733 F.3d at 1138–39 (reviewing the waiver of Rule 12.2(c)'s Fifth Amendment protections after a defendant puts forth a mental-status defense). The 1983 amendments to the federal analogue, F.R.Cr.P. 12.2, reflect that the limitations in the rule are not a hard limit when a defendant presents a defense based on his mental condition. 14A Wright & Miller, Fed. Prac. & Proc. Crim. § 206 ("The rule was qualified [in the 1983 amendments], however, to say that the statements could not be used in evidence against the defendant except on an issue concerning the defendant's mental condition on which the defendant has introduced testimony.").

[¶46]  Third, Dr. Murdock's testimony was permissible through the open-door doctrine. We approach this issue by considering the propriety of Dr. Murdock's testimony offered on the defendant's mental state at the time of the events, which Dr. Wilkinson was tasked to evaluate, as opposed to competency, which Dr. Murdock was ordered to evaluate. "Opening the door" refers to the principle that "when one litigant offers evidence on an issue that is otherwise irrelevant or inadmissible, he cannot complain on appeal 'if the opposing party introduces evidence on the same subject.'" *Bonds v. State*, 2020 WY 61, ¶ 13, 463 P.3d 162, 165 (Wyo. 2020) (quoting *Singer v. Lajaunie*, 2014 WY 159, ¶ 37, 339 P.3d 277, 287 (Wyo. 2014)). The open-door doctrine has limits. *Id.* ¶ 15, 463 P.3d at 166 (citations omitted). A party may not engage in "overkill which is only moderately justified," and a party may not exceed the scope of the open door. *Id.* (citations omitted). When a defendant initiates a line of questioning, the prosecutor is entitled on redirect examination "to make a permissible inquiry without crossing into prosecutorial overkill" where that redirect examination is narrow and brief. *White v. State*, 2003 WY 163, ¶¶ 11–12, 80 P.3d 642, 648–49 (Wyo. 2003) (describing the scope of redirect examination) (citations omitted).

[¶47]  The open-door doctrine applies in the context of psychiatric testimony pursuant to F.R.Cr.P. 12.2(c). "If one party introduces inadmissible testimony, then, at the discretion of the court, the opposing party may also introduce testimony on this same issue to rebut any false impression that may have resulted from the original testimony." *United States v. Kessi*, 868 F.2d 1097, 1108 (9th Cir. 1989) (citation omitted).

> . . . Kessi initially offered testimony on the ultimate issue of his ability to form the requisite intent. Kessi opened the door for Dr. Risse's testimony to rebut that of Dr. Wilson, . . . Dr. Risse's testimony did not violate Rule 12.2(c) because Kessi initially introduced testimony on the issue.

*Id.*

[¶48] Defense counsel opened the door to Dr. Murdock testifying about Mr. Adams's mental status at the time of the events, outside the scope of the competency evaluation. The redirect questioning by the prosecutor was brief and limited to the PTSD issues raised by defense counsel on cross-examination. In conclusion, the self-incriminating statement admitted through Dr. Murdock's testimony, even if it were inadmissible by Wyo. Stat. Ann. § 7-11-303(h), was admissible through the open-door doctrine, and the prosecutor did not cross any line during redirect examination.

### IV. *Dr. Murdock's Testimony Did Not Materially Prejudice Mr. Adams.*

[¶49] We briefly address material prejudice related to Dr. Murdock's testimony as the third prong of our plain error analysis. *King*, 2023 WY 36, ¶ 33, 527 P.3d at 1242. Mr. Adams testified first to his intent when he shot at Trooper Adams. His own statements, which we set forth above, were consistent with the statement he asserts Dr. Murdock should not have shared. We can find no prejudice by Dr. Murdock's statement where Mr. Adams already testified to the same.

[¶50] Our conclusion is corroborated by the trial court's Decision Letter. Contrary to what Mr. Adams argues, the trial court in no way relied on the statements Mr. Adams made to Dr. Murdock when it determined Mr. Adams's guilt. Dr. Murdock is not mentioned in the district court's detailed findings, which identified the evidence the court relied on to support each conviction. The court relied on Mr. Adams's extensive trial testimony about his intent during the events and the lack of evidence to support his defense of mental illness or deficiency. Excluding Dr. Murdock's testimony would have had no impact on the trial court's conviction of Mr. Adams in this case.

[¶51] We find no prosecutorial misconduct related to Dr. Murdock's testimony. Having found no violation of a clear rule of law or material prejudice through either witness's testimony, we decline to consider Mr. Adams's allegations of cumulative error. *Black*, 2017 WY 135, ¶ 46, 405 P.3d at 1060 ("In reviewing for cumulative error, we consider only those matters which we have concluded constitute error.") (quoting *Watts v. State*, 2016 WY 40, ¶ 23, 370 P.3d 104, 112 (Wyo. 2016)).

### *CONCLUSION*

[¶52] The challenged testimony of Drs. Wilkinson and Murdock was permissible under Wyo. Stat. Ann. §§ 7-11-303(h) and -304(h). Mr. Adams was not prejudiced by the testimony of either examiner. Finding no prosecutorial misconduct, we affirm.